## PICCIRILLO v. NEW YORK

No. 97.   Argued November 9, 1970—Decided January 25, 1971

*Malvine Nathanson* argued the cause for petitioner. With her on the briefs was *William E. Hellerstein.*

*Stanley M. Meyer* argued the cause for respondent. With him on the brief was *Eugene Gold.*

PER CURIAM.

The occasion for granting the writ in this case was to resolve the important question whether it is necessary to accord "transactional" immunity, see *Counselman* v. *Hitchcock*, 142 U. S. 547 (1892), to compel a witness to give testimony before a state grand jury over his claim of the privilege against self-incrimination, or whether mere "use" immunity suffices to that end, see, *e. g., Murphy* v. *Waterfront Comm'n*, 378 U. S. 52 (1964); *Uniformed Sanitation Men Assn.* v. *Commissioner of Sanitation of the City of New York*, 426 F. 2d 619 (CA2 1970).

After considering the briefs and oral arguments of the parties on this writ, we have reached the conclusion that the decision of the New York Court of Appeals in *Gold* v. *Menna*, 25 N. Y. 2d 475, 255 N. E. 2d 235 (1969), which makes clear that transactional immunity is required in New York and also indicates that such court's earlier

decision in the case before us, *People* v. *La Bello,* 24 N. Y. 2d 598, 249 N. E. 2d 412 (1969), may have rested on that premise, makes this case an inappropriate vehicle for deciding a question of such far-reaching importance.

With the intervening decision in *Gold,* no controversy any longer exists between the parties as to the question which impelled us to grant the writ: whether, in the circumstances involved in this case, Piccirillo was entitled to "use" or "transactional" immunity. While it is true that, technically speaking, issues remain in the case concerning the kind of immunity required by federal law and, if it be "transactional" rather than "use" immunity in such a case as this, the proper scope of such immunity, both issues arise only against the sterile background of agreement between the parties that Piccirillo is entitled to "transactional" immunity under state law. Thus, our determination upon the fundamental constitutional question underlying this case would be in no sense necessary to its resolution in this instance.

In this posture of affairs, we conclude that the writ of certiorari should be dismissed as improvidently granted.

*It is so ordered.*

MR. JUSTICE BLACK dissents from the dismissal of this writ as improvidently granted. He would vacate the judgment below and remand the case to the New York Court of Appeals for reconsideration in light of its later opinion in *Gold* v. *Menna,* 25 N. Y. 2d 475, 255 N. E. 2d 235.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE MARSHALL concurs, dissenting.

I do not approve dismissal of this writ as improvidently granted.

Petitioner was indicted for assault committed by the use of tire irons. He pleaded guilty and was sentenced

to imprisonment. Shortly thereafter a grand jury was impaneled to investigate the assault on the victim and the conspiracies arising in connection with it. Petitioner, while still serving the sentence on the assault conviction, was called to testify before the grand jury.

After refusing to testify, petitioner was granted immunity. He then testified to the assault which he had perpetrated by the use of tire irons. Four days later a police officer testified before the grand jury that after a chase, he had arrested petitioner and another, and thereupon had taken the tire irons from them. The officer also testified that following petitioner's arrest petitioner had offered the officer a bribe to change his testimony. Petitioner was subsequently indicted by the grand jury for bribery, and, following an unsuccessful motion to dismiss based on the grant of immunity, he pleaded guilty to attempted bribery. The New York Court of Appeals held four-to-three that the New York immunity statute only prohibited use of testimony and the fruits of the testimony in a subsequent criminal proceeding and that the police officer's testimony was in no way derived from anything petitioner said. 24 N. Y. 2d 598, 249 N. E. 2d 412.

*Counselman* v. *Hitchcock,* 142 U. S. 547, held that once immunity was granted, it protected the witness against prosecution not only for a crime that relates to the precise testimony given but also for the fruits of such testimony. *Id.,* at 564–565. But the Court went further: "In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offence to which the question relates." *Id.,* at 586. In *Brown* v. *Walker,* 161 U. S. 591, which involved another federal prosecution, the immunity statute provided that the witness would be protected "on account of any transaction . . . concerning which he may testify." *Id.,* at

594. The Court held that the immunity offered was coterminous with the privilege and that the witness could therefore be compelled to testify. Thus, "transactional immunity" became part of the fabric of our federal constitutional law. See *Ullmann* v. *United States,* 350 U. S. 422, 438.

Now that the Self-Incrimination Clause of the Fifth Amendment is applicable to the States, *Malloy* v. *Hogan,* 378 U. S. 1, the same immunity against state prosecutions must be granted by the States as the Federal Government must grant against federal prosecutions. *Id.,* at 10–11.*

Subsequent to petitioner's case the New York Court of Appeals unanimously concluded that their statute provides transactional immunity. *Gold* v. *Menna,* 25 N. Y. 2d 475, 255 N. E. 2d 235. Nevertheless, that court also concluded that petitioner would not have benefited from the change of law because he gave no testimony which related to the offense for which he was prosecuted. *Id.,* at 481 n. 1, 255 N. E. 2d, at 238 n. 1. That approach to the problem is not in keeping with the generous interpretations which the Fifth Amendment has heretofore received by this Court.

Petitioner had just testified to the grand jury concerning facts which provided the underlying basis for the bribery charge. The grand jury knew petitioner had assaulted a man with tire irons because petitioner himself told them so. The tire irons were the "evidence" which according to the police officer petitioner had tried to bribe him "to get rid of." They were the same tire irons used in the assault for which he was convicted and sentenced, not tire irons used to commit another assault. Moreover,

---

*The present case is not complicated by the question whether *state* immunity must extend immunity against *federal* prosecution. See *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52. Cf. *Abbate* v. *United States,* 359 U. S. 187.

the bribery charge grew out of conversations which petitioner had with the police officer the day of his arraignment on the assault charge. It seems obvious that, if the transactional test is to be honored, this is one of the clearest instances in which to do so.

Accordingly, I would reverse the decision below.

Mr. Justice Brennan, with whom Mr. Justice Marshall joins, dissenting.

This case presents the question of the limitations required by the Fifth Amendment's Self-Incrimination Clause upon subsequent state prosecutions of an individual compelled by the State to answer incriminating questions. Since, in my view, this case presents a record that compels us to decide that question, I cannot agree that the Court may dismiss the writ of certiorari as improvidently granted. I therefore reach the merits and would reverse the judgment of conviction and remand the case with directions to dismiss the indictment.

## I

Petitioner and a codefendant were arrested on March 19, 1964, by a New York police officer, William Sewell, for assaulting one Graham, a housing contractor. Patrolman Sewell recovered the tire irons used in the assault from petitioner and the codefendant at the time of the arrest. The following day, the two defendants were arraigned and released on bond. But before leaving the courthouse, they approached Patrolman Sewell and offered him $1,000 or $1,500 to dispose of the seized weapons. The honest Sewell refused the offer and immediately notified the district attorney of the bribe attempt. At the request of the prosecutor, Sewell later attended a meeting with petitioner to confirm the bribe offer. The relevant narrative skips a year during which petitioner and his codefendant were indicted for attempted assault,

pleaded guilty, and were sentenced to jail. On March 18, 1965, a year after the assault and bribery attempt, petitioner was summoned from jail to appear before a grand jury investigating the possibility of criminal conspiracies in connection with the assault on Graham. The prosecutor, after informing petitioner of the purpose of the investigation, told him that the grand jury was going to vote on whether to give petitioner immunity and explained the meaning of immunity to petitioner as follows:

> "I am going to ask this grand jury to vote on the question of giving you immunity and under Penal Law Section 2447 for the testimony that you will give in this grand jury and that means anything that I ask you and any answers that you give in answer to my questions if it connects you with the crime you cannot be prosecuted for it. That's immunity, do you understand that?" App. 33.

When the grand jury voted to grant immunity, the petitioner said that he would answer the prosecutor's questions, but that he would like to consult his lawyer. The prosecutor refused permission, stating:

> "Under these circumstances you are not a defendant, you are a witness, you have been given immunity. That means you cannot be prosecuted. Your rights are fully protected and there is no reason for your conferring with your attorney, do you understand that?" App. 34.[1]

Petitioner then answered all questions admitting, *inter alia*, that he and his codefendant had been hired to assault and had in fact assaulted Graham; that the tire irons in the possession of the police were the instruments they had

---

[1] Petitioner has argued that he had a right to counsel in the circumstances of this case. In view of my conclusion that petitioner's conviction is invalid under the Fifth and Fourteenth Amendments, I have no occasion to pass upon his Sixth Amendment argument.

used in the assault; and that they had been surprised in the midst of the assault and had run away but had been caught by the police. The bribery attempt was not mentioned.

Four days later, Patrolman Sewell appeared before the same grand jury and testified about the bribe attempt. Several months thereafter, the grand jury indicted petitioner and his codefendant for offering a bribe. Petitioner moved to dismiss the indictment on the ground that the crime charged involved subject matter for which petitioner had been granted immunity, as required by the Federal Constitution. When the trial court denied the motion, petitioner pleaded guilty. The New York Court of Appeals affirmed the conviction, three judges dissenting. *People* v. *La Bello,* 24 N. Y. 2d 598, 249 N. E. 2d 412 (1969). The New York court interpreted the New York immunity statute to prevent only "the use of the witness' testimony and any evidence derived therefrom." 24 N. Y. 2d, at 604, 249 N. E. 2d, at 416. After holding that this "use" immunity satisfied the requirements of the Fifth Amendment, the New York court affirmed petitioner's conviction based on its findings that "[w]hatever evidence might have been revealed by the appellants' testimony was wholly insubstantial" and that "the indictment was not the product of that testimony." 24 N. Y. 2d, at 605, 249 N. E. 2d, at 416.

Seven months after its decision in petitioner's case, the New York Court of Appeals on December 4, 1969, in a case wholly unrelated to petitioner's, reversed itself on the proper interpretation of the New York immunity statute, holding that the New York statute granted "immunity from prosecution for any crime revealed by a witness' testimony before a Grand Jury." *Gold* v. *Menna,* 25 N. Y. 2d 475, 481, 255 N. E. 2d 235, 238. In a footnote to *Gold,* the New York court stated that

even under its new interpretation, petitioner's conviction was correctly affirmed because he and his codefendant "gave no testimony which related or pertained to the offense for which they were prosecuted and of which they were convicted." 25 N. Y. 2d, at 481 n. 1, 255 N. E. 2d, at 238 n. 1. We granted certiorari, 397 U. S. 933 (1970).

## II

The fact that the New York Court of Appeals has reversed itself and changed its interpretation of the New York immunity statute to grant "transactional" immunity, and not merely "use" immunity as that court held when it affirmed petitioner's conviction, provides no basis for dismissing the writ of certiorari as improvidently granted. The state court's interpretation of state law is at best only tangentially related to the federal constitutional question presented in this case. The petitioner here, upon being told "[Y]ou have been given immunity. That means you cannot be prosecuted," proceeded to testify and answer all questions put to him about the Graham assault. Subsequently, he was indicted and convicted for the bribery attempt which arose out of that assault. The New York courts have affirmed petitioner's conviction for bribery, holding that the immunity granted by the state statute did not bar the present conviction. At that point, the relevance to the constitutional question of the scope of immunity afforded by the state court's interpretation of state law ended. The question for this Court is whether the Fifth Amendment, as applied to the States by the Fourteenth Amendment, permits the present conviction to stand in light of the substance of the compelled testimony and the nature and basis of that conviction. That is a matter of federal constitutional law which does not depend upon the interpretation of the New York immunity statute.

The Court's wholly wrong focus upon the particular state immunity statute [2] involved results from its failure to distinguish two different procedural postures in which the question of the scope of immunity required by the Fifth Amendment can be raised. First, an individual may rely on the Fifth Amendment privilege and refuse to answer a question after he has been granted immunity pursuant to an immunity statute and ordered to respond. If he is then held in contempt (or otherwise penalized) for his refusal to answer, the question presented in reviewing the contempt conviction (or other sanction) is whether the statutory grant of immunity is co-extensive with the scope of the privilege against self-incrimination. *Malloy* v. *Hogan,* 378 U. S. 1 (1964); *Counselman* v. *Hitchcock,* 142 U. S. 547 (1892). If the immunity granted is found to be co-extensive with the privilege, then the witness' refusal to answer based on the privilege was unjustified, and the finding of contempt is proper. *Brown* v. *Walker,* 161 U. S. 591 (1896). If, on the other hand, the immunity granted by the statute falls short of the constitutional requirement, the witness properly relied upon his constitutional privilege, and any sanction imposed cannot stand. *McCarthy* v. *Arndstein,* 266 U. S. 34, 42 (1924). In these cases, analysis therefore necessarily focuses on the particular provisions of the immunity statute in question and on the nuances of its inter-

---

[2] If the Court has doubts that petitioner's conviction would still be affirmed in light of the supervening change in the interpretation of state law, the appropriate course would be to remand to the state court for reconsideration, as my Brother BLACK suggests. *Bell* v. *Maryland,* 378 U. S. 226, 228 (1964). The Court's failure to do so presumably rests on the New York court's footnote in its later opinion stating that, in its view, the transactional immunity granted by the New York statute would not affect petitioner's conviction. But if petitioner's conviction is indeed regarded as final under New York law, then the constitutional issue is posed without regard to New York law for the reasons stated in the text.

pretation because there is nothing else before the court. No testimony has yet been compelled, and there has been no subsequent prosecution in any way related to compelled testimony. Most of the cases in which this Court has considered questions of immunity fall into this cate gory,[3] as do the three cases other than the present case cited in the Court's *per curiam* opinion.

The second class of cases, represented by the present one, involves cases in which an individual is granted immunity, proceeds to testify, and is then prosecuted and convicted for an offense related to that testimony. Once the conviction is upheld under the immunity stat- ute, the question in these cases becomes, not whether the statute grants adequate immunity, but, rather, whether the conviction involved, given the substance of the com- pelled testimony, falls within the constitutionally re- quired immunity. This decision, of course, must be made on the basis of federal standards under the Fifth Amendment. *Malloy* v. *Hogan, supra.*

Since the present case falls into the second group of cases, any uncertainty over the interpretation of the state immunity statute has little bearing on the question whether this Court, having agreed to hear the case, ought to decide the merits. What is relevant is that the pres-

---

[3] *E. g., Gardner* v. *Broderick,* 392 U. S. 273 (1968); *Uniformed Sanitation Men Assn.* v. *Commissioner of Sanitation,* 392 U. S. 280 (1968); *Malloy* v. *Hogan,* 378 U. S. 1 (1964); *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52 (1964); *Ullmann* v. *United States,* 350 U. S. 422 (1956); *Hoffman* v. *United States,* 341 U. S. 479 (1951); *United States* v. *Murdock,* 284 U. S. 141 (1931); *McCarthy* v. *Arndstein,* 266 U. S. 34 (1924); *Hale* v. *Henkel,* 201 U. S. 43 (1906); *Ballmann* v. *Fagin,* 200 U. S. 186 (1906); *Jack* v. *Kansas,* 199 U. S. 372 (1905); *Brown* v. *Walker,* 161 U. S. 591 (1896); *Counselman* v. *Hitchcock,* 142 U. S. 547 (1892). But see, *e. g., Adams* v. *Maryland,* 347 U. S. 179 (1954); *Smith* v. *United States,* 337 U. S. 137 (1949); *Feldman* v. *United States,* 322 U. S. 487 (1944); *Heike* v. *United States,* 227 U. S. 131 (1913).

ent case comes to this Court with a complete factual record raising the constitutional question of the scope of immunity required by the Fifth Amendment privilege. It is worth noting that cases falling in the first class present the court with a bare record, consisting of no more than the text of the immunity statute in question and the witness' refusal to answer a question. Without a factual record, the Court is required to decide "abstract controvers[ies] over the use of . . . words," *Regal Knitwear Co.* v. *NLRB*, 324 U. S. 9, 15 (1945), even though the Court has long recognized that important constitutional issues are best decided on the basis of factual records which tender the "underlying constitutional issues in clean-cut and concrete form." *Rescue Army* v. *Municipal Court*, 331 U. S. 549, 584 (1947). The absence of such a record is particularly unfortunate in these Fifth Amendment cases because the constitutional issue posed depends upon a judgment as to how broad a protection is necessary to serve the values, purposes, and policies underlying the Fifth Amendment. A factual record showing, for example, the substance of the individual's compelled testimony, the way that testimony was subsequently used by the prosecutor, and the crime for which the individual was ultimately prosecuted, provides important considerations to anchor and inform the constitutional judgment.

Unlike most of the cases in which this Court has considered the scope of immunity required by the Fifth Amendment, the present case offers the Court that factual background.

In the nature of a confession and avoidance, the *per curiam* concedes that the issues "concerning the kind of immunity required by federal law and, if it be 'transactional' rather than 'use' immunity in such a case as this, the proper scope of such immunity" are presented by petitioner's case, but offers three statements in support

of dismissal. First, the Court states that "no controversy any longer exists between the parties as to the question which impelled us to grant the writ: whether, in the circumstances involved in this case, Piccirillo was entitled to 'use' or 'transactional' immunity." As the first sentence of the *per curiam* itself recognizes, the question which impelled us to grant the writ was whether *the Federal Constitution* requires "use" or "transactional" immunity, as those terms have been defined in federal constitutional law. The parties have always disagreed and continue to disagree over that question,[4] thus the

---

[4] Not only do the parties disagree on the extent of the federal constitutional protection, but both parties also see a decision on that sharply disputed question as *necessary* to a decision of this case:

Counsel for respondent:

"[I]f transactional immunity is required by the federal Constitution, then the decision of the Court of Appeals that this was or wasn't a thing as specified in the New York State statute, is a matter of federal importance, and it is to be decided by a uniform standard.

"On the other hand, if the only thing that the Constitution requires is a use plus fruits immunity, then when New York decided whether this crime, this bribery was one of the things testified to in the grand jury, becomes strictly a matter of the state interpretation of its own statute, and there is no federal constitutional question involved.

"*And so it is necessary to decide whether transactional immunity is required by the federal Constitution.* Now, the petitioner relies a great deal on the case of Counselman vs. Hitchcock. Now, it is our position that Counselman vs. Hitchcock is not the law any more, that it has been overruled, or if it hasn't, it should be . . . ." Tr. of Oral Arg. 24 (emphasis added).

Counsel for petitioner:

"This is the transaction[al] immunity rule that we assert is required under the Fifth Amendment . . . .

"It is our position that this is the rule that first was enunciated in the first case in this Court to deal with the question of immunity and the abrogation of the Fifth Amendment privilege in Counselman

Court's statement that "no controversy any longer exists . . . as to [that] question" is simply contrary to fact.

The Court then suggests that the "agreement between the parties that Piccirillo is entitled to 'transactional' immunity *under state law*" (emphasis added) somehow renders this case an inappropriate one for our decision on the federal constitutional question. The phrase "transactional" immunity is just that—a phrase or shorthand symbol. Something labeled "transactional" immunity by a state court may or may not coincide with the constitutional "transactional" immunity defined by decisions of this Court. Indeed, the petitioner vigorously argues that the state immunity granted in this case falls far short of the "transactional" immunity defined by federal constitutional standards. Thus it is fair to describe the "agreement" between the parties to which the Court refers, as merely an agreement that the New York Court of Appeals, in describing the immunity granted by the state statute, used the label "transactional" immunity. Moreover, since the State has finally affirmed petitioner's conviction in this case, the precise formulation of the immunity granted by state law does not, in any event, have any relevance to our consideration of the constitutional validity of petitioner's conviction.[5] The Court makes no reference to what is relevant—the

---

vs. Hitchcock. It has been constantly reiterated in numerous decisions of this Court, and we believe it is a very sound rule.

·    ·    ·    ·    ·

"So we feel that there was no question but that there was a substantial relationship [between the compelled testimony and petitioner's conviction] and that under the transactional immunity test, which we contend is a federal constitutional test, and as it has been explained by this Court in Heike and applied in other cases, the bribery indictment must be found to have been covered by the transaction[al] immunity to which this petitioner was entitled." *Id.*, at 11, 15.

[5] See *supra*, at 555–558.

facts of petitioner's compelled testimony and his present conviction.

Finally, the Court asserts that "our determination upon the fundamental constitutional question underlying this case would be in no sense necessary to its resolution in this instance." This is simply not so. If the Court resolves this case, it must make a "determination upon the fundamental constitutional question." Indeed, the *per curiam* has already conceded that. The issue is why resolution of this case, and hence decision on the constitutional question, is being withheld. In my judgment, the Court has yet to articulate a reason for not deciding this case.

In sum, the Court attempts, none too successfully in my judgment, to create a smokescreen by focusing on questions of state law. Petitioner's conviction, without more, squarely raises the federal constitutional question on a concrete, factual record which provides an excellent basis for constitutional adjudication. Under these circumstances, there exists no basis upon which the Court can justify dismissal of the writ of certiorari as improvidently granted. I therefore turn to the merits.

## III

Only one sovereignty, New York State, is involved. Thus the case raises the basic question of the constitutional restrictions upon the power of a state government to prosecute an individual for matters related to incriminating testimony which that State has compelled the individual to give. Unlike, for example, *Murphy* v. *Waterfront Comm'n*, 378 U. S. 52 (1964), there is no problem here of limitations imposed on other jurisdictions by New York's act of compelling petitioner to testify against himself. And "where there is only one government involved, be it state or federal, not only is the danger of prosecution more imminent and indeed the likely purpose of the investigation to facilitate prose-

cution and conviction, but that authority has the choice. of exchanging immunity for the needed testimony." *Id.*, at 98 (WHITE, J., concurring).

I believe that the Fifth Amendment's privilege against self-incrimination requires that any jurisdiction that compels a man to incriminate himself grant him absolute immunity under its laws from prosecution for any transaction revealed in that testimony.[6] Such transactional immunity, in my view, steers a well-conceived middle path between, on the one hand, a position that no immunity statute can supplant the constitutional privilege and, on the other, a position that affords the individual the altogether too narrow protection of use immunity as applied to the very government that has compelled him to incriminate himself. While a position broader than transactional immunity finds some support in the language and history of the Fifth Amendment,[7] the

[6] "Transactional" immunity presupposes "use" immunity. "[C]ompelled testimony and its fruits cannot be used in any manner . . . in connection with a criminal prosecution against [the witness]." *Murphy* v. *Waterfront Comm'n*, 378 U. S. 52, 79 (1964).

[7] Historians have noted that the clause itself is absolute and may not originally have been viewed as allowing the government to compel men to incriminate themselves if it only promised not to prosecute them for the crimes revealed:

"The clause by its terms also protected against more than just 'self-incrimination,' a phrase that had never been used in the long history of its origins and development. The 'right against self-incrimination' is a short-hand gloss of modern origin that implies a restriction not in the constitutional clause. The right not to be a witness against oneself imports a principle of wider reach, applicable, at least in criminal cases, to the self-production of any adverse evidence, including evidence that made one the herald of his own infamy, thereby publicly disgracing him.

"The state courts of the framers' generation followed the extension of the right to cover self-infamy as well as self-incrimination, although the self-infamy rule eventually fell into disuse." L. Levy, *Origins of the Fifth Amendment* 427, 429 (1968).

requirements of today's society and broad governmental economic regulation combined with the existence of the adequate alternative of transactional immunity convince me that the Constitution does not require so sweeping an interpretation as completely to invalidate the immunity technique. Mere use immunity, which protects the individual only against the actual use of his compelled testimony and its fruits, satisfies neither the language of the Constitution itself nor the values, purposes, and policies that the privilege was historically designed to serve and that it must serve in a free country. Finally, this Court's decisions in the course of the past century have consistently read the Constitution as requiring no more, but no less, than transactional immunity.

The Fifth Amendment's guarantee against self-incrimination—"No person . . . shall be compelled in any criminal case to be a witness against himself"—has occupied a central place in our jurisprudence, since before the Nation's birth:

> "By 1776 the principle of the *nemo tenetur* maxim was simply taken for granted and so deeply accepted that its constitutional expression had the mechanical quality of a ritualistic gesture in favor of a self-evident truth needing no explanation." L. Levy, Origins of the Fifth Amendment 430 (1968).

Not only the Federal Constitution, but every State guarantees the individual the privilege against self-incrimination, all States save two by provision in the state constitution.[8] This Court has repeatedly emphasized its role as guardian against even inadvertent or gradual erosion of the guarantee. "This provision must have a

---

[8] See 8 J. Wigmore, Evidence § 2252 and n. 3 (McNaughton rev. 1961).

broad construction in favor of the right which it was intended to secure." *Counselman* v. *Hitchcock,* 142 U. S., at 562. The Court's holding that the Fifth Amendment privilege "is also protected by the Fourteenth Amendment against abridgment by the States," *Malloy* v. *Hogan,* 378 U. S. 1, 6 (1964), is modern affirmation that the privilege is the "essential mainstay" of the American accusatorial system of criminal prosecution, *id.,* at 7; *Malloy* held that the Fourteenth Amendment applied the privilege's requirements to the States as fully as to the Federal Government.

The words of the Fifth Amendment do not, in terms, suggest that government may compel men to incriminate themselves provided it promises that it will not prosecute them for the crimes revealed. The clause does not prohibit a *prosecution* or *conviction;* it prohibits the application *vel non* of compulsion to an individual to force testimony that incriminates him, regardless of whether he is actually prosecuted. Historically, one of the major evils sought to be allayed by the development of the privilege was the use of torture to extract a confession,[9] not the subsequent use of the confession in a criminal trial. We continue to recognize this distinction; for example, we permit the use of voluntary confessions in criminal prosecutions.[10] Thus we object not so much to convicting a man on the basis of evidence from his own mouth, but rather to the practice of compelling him to incriminate himself, regardless of a subsequent prosecution.

Implicitly, of course, "in any criminal case" suggests a limitation upon the reach of the privilege, although

[9] See *Brown* v. *Walker,* 161 U. S. 591, 596–597 (1896); Levy, n. 7, *supra,* at 426 and *passim.*

[10] Talmudic law prohibits the admission in evidence of any self-incriminatory testimony or statement, even if voluntarily given. Levy, n. 7, *supra,* at 433–441.

ever since Mr. Chief Justice Marshall's opinion in the *Aaron Burr* case, the reach has been the *possibility* of a criminal charge, not whether one is in fact brought. *United States* v. *Burr*, 25 F. Cas. 38 (No. 14692e) (C. C. D. Va. 1807). But if there is no possibility of a criminal case, then the privilege would not apply. And that is precisely the basis on which this Court has consistently upheld grants of immunity from *Brown* v. *Walker*, 161 U. S. 591 (1896), to *Ullmann* v. *United States*, 350 U. S. 422 (1956):

> "[I]f [a man's] testimony operate[s] as a complete pardon for the offence to which it relates—a statute absolutely securing to him such immunity from prosecution would satisfy the demands of the clause in question." *Brown* v. *Walker*, 161 U. S., at 595.

Or, as the Court put it more succinctly 10 years later,

> "if the criminality has already been taken away, the Amendment ceases to apply." *Hale* v. *Henkel*, 201 U. S. 43, 67 (1906).

It is clear, of course, that mere "use" immunity does not "operate as a complete pardon for the offence," nor does it take the criminality away from the testimony in question. If the individual is only promised that the Government will not actually use his compelled testimony or its fruits to convict him, he is still being compelled to testify against himself "in [a] criminal case," in clear contradiction of the constitutional command. He is still being forced by the State to admit criminal conduct for which he may be punished, albeit not on the basis of his compelled testimony.

The policies and purposes which the privilege serves are promoted by the transactional immunity standard. Mr. Justice Frankfurter's oft-quoted remark that "[t]he privilege against self-incrimination is a specific provision of which it is peculiarly true that 'a page of history is

worth a volume of logic,' " *Ullmann* v. *United States,* 350
U. S., at 438, reflects the fact that the privilege safeguards
many interrelated fundamental values: "It will not do,
therefore, to assign one isolated policy to the privilege,"
*Murphy* v. *Waterfront Comm'n,* 378 U. S., at 56 n. 5,
and attempt to argue from "the" policy so identified. In
*Murphy,* the Court identified some of the complex of
values that the privilege serves:

> "[O]ur unwillingness to subject those suspected of
> crime to the cruel trilemma of self-accusation, per-
> jury or contempt; our preference for an accusatorial
> rather than an inquisitorial system of criminal jus-
> tice; our fear that self-incriminating statements will
> be elicited by inhumane treatment and abuses; our
> sense of fair play which dictates 'a fair state-individ-
> ual balance by requiring the government to leave the
> individual alone until good cause is shown for dis-
> turbing him and by requiring the government in its
> contest with the individual to shoulder the entire
> load'; our respect for the inviolability of the hu-
> man personality and of the right of each individ-
> ual 'to a private enclave where he may lead a private
> life'; our distrust of self-deprecatory statements;
> and our realization that the privilege, while some-
> times 'a shelter to the guilty,' is often 'a protection
> to the innocent.' " *Id.,* at 55 (citations omitted).

I quote this summary of some of the values and pur-
poses served by the privilege at such length because I
think it is noteworthy that many, if not most, of them are
severely infringed by compelling an individual to testify
under any circumstances. I do not seek to reopen the
debate of *Brown* v. *Walker, supra,* and *Ullmann* v. *United
States, supra,* whether the Fifth Amendment is compat-
ible with immunity statutes of any nature, not only be-
cause *Brown* and *Ullmann* foreclose that inquiry, but also
because the competing considerations identified in those

opinions and my Brother WHITE's concurring opinion in *Murphy*, 378 U. S., at 93–96, as well as the language of the Fifth Amendment, convince me that that result is not required. It is, however, important to appreciate the breadth and significance of the values that the Fifth Amendment was designed to protect.

In light of those values, it seems clear to me that mere "use" immunity is insufficient when the government involved is the one that has compelled the incriminating testimony. It has been argued that if the State is prohibited from using testimony or information obtained by compulsion, then both the government and the individual are in the same position as if the witness had not testified. As the *Murphy* statement of values shows, from the standpoint of the individual (which is also the standpoint of the Fifth Amendment) that is simply not true. The individual has been compelled to incriminate himself, and if he is granted only use immunity, compelled to do so in matters for which he may ultimately be prosecuted. Even from the standpoint of the State it clearly is not in the same position that it would have been had it not compelled the witness to testify. It has obviously obtained information, which may help it to pursue its general investigation, as well as its specific investigation of others. Whether that information will enable the investigation to generate enough steam and continue long enough to produce "independent" evidence incriminating the individual originally compelled to testify is an open question. In short, use immunity literally misses half the point of the privilege, for it permits the compulsion without removing the criminality. See *Hale* v. *Henkel, supra.*

Finally, the uncertainties of the factfinding process argue strongly against "use" immunity and in favor of transactional immunity. This Court has recognized that "[t]here is always in litigation a margin of error, repre-

senting error in factfinding, which both parties must take into account." *Speiser* v. *Randall*, 357 U. S. 513, 525 (1958). In dealing with a single jurisdiction, we ought to recognize the enormous difficulty in attempting to ascertain whether a subsequent prosecution of an individual, who has previously been compelled to incriminate himself in regard to the offense in question, derives from the compelled testimony or from an "independent source." For one thing, all the relevant evidence will obviously be in the hands of the government—the government whose investigation included compelling the individual involved to incriminate himself. Moreover, this argument does not depend upon assumptions of misconduct or collusion among government officers. It assumes only the normal margin of human fallibility. Men working in the same office or department exchange information without recording carefully how they obtained certain information; it is often impossible to remember in retrospect how or when or from whom information was obtained. By hypothesis, the situation involves one jurisdiction with presumably adequate exchange of information among its various law enforcement officers. Moreover, the possibility of subtle inferences drawn from action or non-action on the part of fellow law enforcement personnel would be difficult if not impossible to prove or disprove. This danger, substantial when a single jurisdiction both compels incriminating testimony and brings a later prosecution, may fade when the jurisdiction bringing the prosecution differs from the jurisdiction that compelled the testimony. Concern over informal and undetected exchange of information is also correspondingly less when two different jurisdictions are involved.

Transactional immunity raises none of these problems. It provides the individual with an assurance that he is not testifying about matters for which he may later be

prosecuted. No question arises of tracing the use or non-use of information gleaned from the witness' compelled testimony. The sole question presented to a court is whether the subsequent prosecution is related to the substance of the compelled testimony. Both witness and government know precisely where they stand. Respect for law is furthered when the individual knows his position and is not left suspicious that a later prosecution was actually the fruit of his compelled testimony.

The transactional immunity standard was first articulated by this Court in *Counselman* v. *Hitchcock, supra,* in 1892; it has consistently been reaffirmed and reiterated in both holding and dicta ever since, and has never been seriously questioned in a case involving the actions of a single jurisdiction. In *Counselman,* the Court held that the immunity granted by an 1868 federal statute was inadequate to supplant the right of the witness to rely on his constitutional privilege: "In view of the constitutional provision, a statutory enactment, to be valid, must afford *absolute immunity against future prosecution* for the offence to which the question relates." 142 U. S., at 586 (emphasis added). Four years later, the Court in *Brown* v. *Walker, supra,* upheld a contempt conviction for a witness' refusal to answer a question after he had been granted immunity under a new 1893 federal statute enacted after the *Counselman* decision. The 1893 statute provided,

> "[N]o person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify." Act of February 11, 1893, 27 Stat. 443, 49 U. S. C. § 46.

Finding that under this statute a witness' testimony "operate[s] as a . . . pardon" for criminal conduct to which it relates, the Court held that the statute "fully accomplished" the Fifth Amendment objective. 161 U. S., at

610. Only by relying on full transactional immunity did the Court sustain the immunity statute before it over the dissent of four Justices who thought the statute's protection still not coextensive with the constitutional privilege. 161 U. S., at 610–638 (dissenting opinions of Shiras and Field, JJ.).

In *Hale* v. *Henkel, supra,* the Court sustained a contempt citation for refusing to answer questions after transactional immunity had been granted under a federal immunity statute, resting on the proposition that "if the criminality has already been taken away, the Amendment ceases to apply." 201 U. S., at 67. In 1924, Mr. Justice Brandeis, speaking for a unanimous Court, held the privilege was available to a bankrupt subpoenaed before a special commissioner for examination

> "because the present statute fails to afford complete immunity from prosecution. If Congress should hereafter conclude that a full disclosure of the bankrupt estate by the witnesses is of greater importance than the possibility of punishing them for some crime in the past, it can, as in other cases, confer the power of unrestricted examination by providing complete immunity. Compare *Brown* v. *Walker,* 161 U. S. 591; *Glickstein* v. *United States,* 222 U. S. 139, 142; *Ensign* v. *Pennsylvania,* 227 U. S. 592." *McCarthy* v. *Arndstein,* 266 U. S. 34, 42.

See also *United States* v. *Monia,* 317 U. S. 424, 428 (1943) (*Counselman* "indicated clearly that nothing short of absolute immunity would justify compelling the witness to testify if he claimed his privilege"); *Smith* v. *United States,* 337 U. S. 137, 147 (1949) (transactional immunity "met the 'absolute' test of the constitutional provision against self-incrimination").

By 1956, Mr. Justice Frankfurter, writing for the Court, could assert that the 1893 statute, enacted shortly after *Counselman* and adopting the transactional immunity standard, had "become part of our constitutional fabric." *Ullmann* v. *United States*, 350 U. S. 422, 438. Again, the Court in *Ullmann* relied on the transactional immunity standard to reaffirm the holding of *Brown* v. *Walker* against the dissent of two Justices who repeated the arguments of the *Brown* dissenters that even transactional immunity did not satisfy the constitutional privilege. *Ullmann* v. *United States, supra*, at 440–455.

*Ullmann*'s assertion that transactional immunity has become part of our "constitutional fabric" finds support in the action of Congress in the 78 years since *Counselman* first announced the standard. Congress has written more than 40 immunity provisions into various federal statutes during that time, and with one minor and unexplained exception in 1898 and two exceptions in 1970,[11] every provision has provided for transactional immunity.[12] Moreover, as reflected by an appendix in petitioner's brief, the majority of state immunity statutes provide for transactional immunity, even though the States were not·

---

[11] 11 U. S. C. § 25 (a) (10). This immunity provision was first enacted in the Bankruptcy Act of July 1, 1898, § 7 (a) (9), 30 Stat. 548, six years after *Counselman*. Professor Wigmore has speculated that the drafters of this provision were hostile to the Bankruptcy Act and purposely drafted an imperfect immunity. 8 J. Wigmore, Evidence § 2283, p. 528 (3d ed. 1940). *McCarthy* v. *Arndstein*, 266 U. S. 34 (1924), established that the immunity granted by the section is inadequate to remove the constitutional privilege. Title 18 U. S. C. § 6002 (1970 ed.) codifies the use immunity provision enacted in the Organized Crime Control Act of 1970, 84 Stat. 927; 21 U. S. C. § 884 (1970 ed.) codifies the use immunity provision enacted in § 514 (a) of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 84 Stat. 1278.

[12] 8 J. Wigmore, Evidence § 2281, p. 495 n. 11 (McNaughton rev. 1961), and 1970 Supp., p. 51.

subject to the full effect of the Fifth Amendment until 1964. *Malloy* v. *Hogan, supra.*

The wisdom of this consistent view of the protection required by the Fifth Amendment is illustrated and supported by the facts of this case. At the time the petitioner was summoned from his prison cell to testify before the grand jury, the prosecutor knew that the petitioner had offered to bribe Patrolman Sewell. He knew that the basis of the bribery was the assault on Graham and that petitioner had sought to influence Sewell to dispose of the tire irons involved in the assault. Nonetheless, the District Attorney made his decision: he elected to call petitioner before the grand jury which was investigating various conspiracies associated with that assault. Before the grand jury, the prosecutor obtained immunity for petitioner and, under the threat of contempt, compelled the petitioner to testify about the assault and about various matters connected with it. The petitioner complied, relinquishing his constitutionally guaranteed right not to incriminate himself, in the face of a considered decision by a state official to utilize official state processes to compel him to testify.

This Court emphasized in *Brown* v. *Walker, supra,* one of the major evils the Amendment was designed to guard against:

> "[I]f an accused person be asked to explain his apparent connection with a crime under investigation, the ease with which the questions put to him may assume an inquisitorial character, the temptation to press the witness unduly, to browbeat him if he be timid or reluctant, to push him into a corner, and to entrap him into fatal contradictions, which is so painfully evident in many of the earlier state trials . . . made the system so odious as to give rise to a demand for its total abolition. . . . So deeply

did the iniquities of the ancient system impress themselves upon the minds of the American colonists that the States, with one accord, made a denial of the right to question an accused person a part of their fundamental law." 161 U. S., at 596–597.

So too in this case: an accused was put in the same position, with the same attendant temptations and pressures upon the prosecutor. That the questioning occurred in the secrecy of the grand jury, does not affect the protection afforded the individual by the Constitution. Only if both prosecutor and witness are clearly on notice that questioning about an incident will relieve the witness of all criminal liability substantially related to that subject can we guarantee that the inquisitorial character of the proceeding will be removed, and still allow the prosecutor to seek out facts relevant to the crimes of others.

## IV

Under the transactional immunity standard, I do not believe that petitioner's conviction can stand. Mr. Justice Holmes, in *Heike* v. *United States,* 227 U. S. 131 (1913), in interpreting a federal immunity statute so as to render it "coterminous with what otherwise would have been the privilege of the person concerned," 227 U. S., at 142, held that "[w]hen the statute speaks of testimony concerning a matter it means concerning it in a substantial way." *Id.,* at 144. I agree that immunity attaches only to matters substantially related to the compelled testimony.

Petitioner testified that he had committed the assault on Graham with tire irons. He testified that the tire irons in the possession of the police were the tire irons that he had used. He testified that he was caught immediately after the assault by the police, taken to the station house, booked on the assault charge, and released on bail the next day. His testimony carried

right up to the time Patrolman Sewell later testified that petitioner offered him a bribe; it concerned the events and underlying circumstances that gave rise to the bribe. It established the motive for the bribe and established all the facts underlying the substance of the bribe. These are not facts that had "no connection" with the subsequent prosecution, see *Heike* v. *United States,* 227 U. S., at 143–144; to the contrary, they were not merely substantially related to the bribery charge, but actually quite pertinent to that prosecution. Consequently, petitioner's motion to dismiss the indictment should have been granted.

I would reverse the judgment below and remand with instructions to dismiss the indictment.