**STATE of Alaska, Petitioner,**

v.

**The Honorable Rene J. GONZALEZ, Judge of the Superior Court, Jill Jahnke–Leland, Peter H. Leland, and Jeffrey S. DeGrasse, Respondents.**

No. S–5003.

Supreme Court of Alaska.

June 4, 1993.

---

Eric A. Johnson, Asst. Atty. Gen., Anchorage, Charles E. Cole, Atty. Gen., Juneau, for petitioner.

Margi Mock, Ray Brown, Asst. Public Defenders, John B. Salemi, Public Defender, Anchorage, for respondent Jeffrey S. DeGrasse.

Jeffrey F. Sauer, Juneau, for respondent Jill Jahnke–Leland.

Before MOORE, C.J., and RABINOWITZ, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

MATTHEWS, Justice.

▮ Article I, section 9 of the Alaska Constitution states that "[n]o person shall be compelled in any criminal proceeding to be a witness against himself." This section does not prohibit compelling a person to testify in a criminal case against another person, even though the testimony may show that the witness was guilty of a crime. *Surina v. Buckalew*, 629 P.2d 969 (Alaska 1981); *State v. Serdahely*, 635 P.2d 1182 (Alaska 1981) (per curiam). However, a witness who is compelled to testify must be granted some type of immunity from prosecution.

▮ There are two types of immunity from prosecution in current usage. Transactional immunity, the more protective type, prohibits prosecution of a compelled witness for a crime concerning which the witness is compelled to testify. The narrower form, use and derivative use immunity, allows prosecution of the witness for the crimes referred to in the compelled testimony, but prohibits the use of the compelled testimony and its fruits in such prosecutions. *Surina*, 629 P.2d at 971, n. 2. In *Surina* and *Serdahely*, pursuant to our supervisory powers, we approved of transactional immunity as a matter of practice but expressed no view as to whether use and derivative use immunity might also be constitutionally permissible.

Alaska Statute 12.50.101, enacted after *Surina* and *Serdahely* were decided, authorizes an order compelling testimony based on a grant of use and derivative use immunity. In the present case this statute has been challenged as unconstitutional under article I, section 9 of the Alaska Constitution. The superior court and the court of appeals have concluded that the statute is unconstitutional. We granted the state's petition and now affirm the decision of the court of appeals.

## FACTS AND PROCEEDINGS

On the evening of May 8, 1990, Jill Jahnke–Leland, Carl Jahnke–Leland, Peter Leland, and Jeffrey DeGrasse were arrested for the murder of Rick Zaug and the attempted murder of Tom Moore. Earlier that day Zaug and Moore had sailed from Ketchikan to Thorne Arm to go fishing. That evening the two men tied their boat to a public mooring buoy to which another boat was already tied. Soon thereafter a tragic dispute arose over use of the buoy. After angry words were exchanged, Moore and Zaug were fired upon from the shore; Zaug was killed and Moore was seriously injured.

Leland, DeGrasse, and Carl and Jill Jahnke–Leland all gave taped statements to the police. Leland and DeGrasse admitted that each had shot at Zaug and Moore from the shore. Jill Jahnke–Leland stated that after she had words with Zaug and Moore, she headed toward shore and fired a gun shot in the air to scare Zaug and Moore. Jill Jahnke–Leland also stated that soon after she fired that shot into the air, DeGrasse and Leland began firing.

Leland, DeGrasse, and Carl and Jill Jahnke–Leland were each indicted for first-degree murder, attempted first-degree murder, and first-degree assault. Jill Jahnke–Leland was convicted of manslaughter and assault. She appealed to the court of appeals. Her appeal was pending during the proceedings hereinafter de-

scribed and during the presentation and consideration of this case by this court.[1]

In the subsequent trial against Leland and DeGrasse, the state moved to compel Jill Jahnke–Leland to testify under AS 12.-50.101.[2] Alaska Statute 12.50.101 allows the state to compel a witness to testify in exchange for immunity from use or derivative use of the compelled testimony in a criminal prosecution. The trial court denied the state's motion, ruling that AS 12.-50.101 violates article I, section 9 of the Alaska Constitution, which protects individuals against compelled self-incrimination.[3] Leland and DeGrasse were then tried without Jill Jahnke–Leland's testimony. The trial ended with a hung jury. On retrial, the state renewed its motion to compel Jill Jahnke–Leland to testify. The trial court again denied the motion on constitutional grounds. The state sought review and the court of appeals affirmed the trial court's decision. *State v. Gonzalez*, 825 P.2d 920 (Alaska App.1992). We granted the state's petition for hearing from this decision.

## IMMUNITY AND THE PRIVILEGE AGAINST SELF–INCRIMINATION

This case presents two issues: (1) What is the scope of the Alaska Constitution article I, section 9 privilege against self-incrimination? and (2) Does AS 12.50.101 provide immunity which adequately

matches the protection of the constitutional privilege? We address each issue in turn.

*Scope of the Privilege*

 The issue of the scope of article I, section 9 is a question of constitutional law which we decide *de novo*. Constitutional interpretation follows the "rule that the intent underlying ... constitutional language should first be gathered from the plain meaning of the language itself." *Baker v. City of Fairbanks*, 471 P.2d 386, 397 (Alaska 1970). As the court of appeals recognized, this inquiry is not controlled by any one source of authority, such as United States Supreme Court precedent or an appeal to the intent of the framers of the Alaska Constitution. Rather, such authority is considered and, when appropriate, followed when helpful in discerning the "intention and spirit of our *local constitutional language* and [whether the right invoked is] necessary for the kind of civilized life and ordered liberty which is at the core of our constitutional heritage." *Id.* at 402 (emphasis added).

 In the present case, our inquiry is controlled by Alaska precedent. The state and DeGrasse acknowledge that the scope of article I, section 9 is set forth in *E.L.L. v. State*, 572 P.2d 786 (Alaska 1977):

The privilege against self-incrimination applies where the answers elicited could

1. Shortly before the publication of this opinion the court of appeals affirmed her conviction and remanded her sentence. *Jahnke–Leland v. State*, Mem.Op. & J. No. 2675 (Alaska App., April 21, 1993). The progress of Jill Jahnke–Leland's appeal is relevant if her conviction becomes final before the state compels her to testify. In that event, Jill Jahnke–Leland would no longer be subject to conviction or punishment on account of her compelled testimony. Without the threat of conviction or punishment, an individual may no longer invoke the protection of the privilege against self-incrimination. *E.L.L. v. State*, 572 P.2d 786, 788 (Alaska 1977) ("a witness may not refuse to testify where there is no real or substantial hazard of incrimination."). Additionally, if Jill Jahnke–Leland was compelled to testify while her appeal was pending, transactional immunity would *not* invalidate her prior conviction; instead, transactional immunity would only bar retrial if her conviction was reversed on appeal. *See State v. Runions*, 100 Wash.2d 52, 665 P.2d 1358, 1360

(1983) (citing *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)).

2. AS 12.50.101 states, in relevant part, that the state may compel testimony upon the condition that:

 no testimony or other information compelled ..., or information directly or indirectly derived from that testimony or other information, may be used against the witness in a criminal case, except in a prosecution based on perjury, giving a false statement, or otherwise knowingly providing false information, or hindering prosecution.

 AS 12.50.101(a).

3. Article I, section 9 of the Alaska Constitution reads as follows:

 **Section 9. Jeopardy and Self–Incrimination.** No person shall be put in jeopardy twice for the same offense. No person shall be compelled in any criminal proceeding to be a witness against himself.

support a conviction or might furnish a link in the chain of evidence leading to a conviction. But, a witness may not refuse to testify where there is no *real* or substantial hazard of incrimination....

*Id.* at 788 (citations omitted). Thus, in *Surina v. Buckalew,* 629 P.2d 969, 977 (Alaska 1981), we stated: "where the hazard of incrimination has been removed, the privilege against self-incrimination is no longer required." *Surina,* however, left open the question of what type of immunity would "remove" "the hazard of incrimination." From these authorities we can piece together the scope of the article I, section 9 protection against self-incrimination: (1) an individual may not be compelled to give testimony unless the state has taken measures to remove the hazard of incrimination; and (2) an individual faces a hazard of incrimination whenever "the answers elicited could support a conviction or might furnish a link in the chain of evidence leading to a conviction." [4]

*AS 12.50.101 and the Scope of the Privilege*

■ We now reach the question at the center of this case: does a grant of use and derivative use immunity remove the hazard of incrimination? We do not doubt that, in theory, strict application of use and derivative use immunity would remove the hazard of incrimination. *See Kastigar v. United States,* 406 U.S. 441, 468, 92 S.Ct. 1653, 1668, 32 L.Ed.2d 212 (1972) (Marshall,

J., dissenting). In a perfect world, one could theoretically trace every piece of evidence to its source and accurately police the derivative use of compelled testimony. In our imperfect world, however, the question arises whether the judicial process can develop safeguards to prevent derivative use of compelled testimony that satisfy article I, section 9. Because we doubt that workaday measures can, *in practice,* protect adequately against use and derivative use, we ultimately hold that AS 12.50.101 impermissibly dilutes the protection of article I, section 9. Our conclusion rests on two bases.

First, we are persuaded that problems of proof and ordinary human frailties combine to pose a potent threat to an individual compelled to testify. The accused faces proof problems because all evidence regarding use of compelled testimony necessarily rests in the hands of the state. Human frailty presents a further obstacle because the accused is reduced to probing the faded memories and incomplete recollections of the state's agents in tracing the path of the compelled testimony from the point where it is given to the point where it is used. Justice William Brennan expressed these twin concerns in his dissent in *Piccirillo v. New York,* 400 U.S. 548, 552, 91 S.Ct. 520, 522, 27 L.Ed.2d 596 (1971) (Brennan, J., dissenting). According to Justice Brennan:

---

**4.** This scope largely parallels the scope the Supreme Court has set for the Fifth Amendment. *Kastigar v. United States,* 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972). None of the parties have suggested, nor do we consider, Justice William O. Douglas' position that the privilege "put[s] it beyond the power of [government] to *compel* anyone to confess his crimes." *Id.* at 467, 92 S.Ct. at 1668 (emphasis added) (Douglas, J., dissenting); *see Ullmann v. United States,* 350 U.S. 422, 446, 76 S.Ct. 497, 511, 100 L.Ed. 511 (1956) (Douglas, J., dissenting).

At times, DeGrasse claims to broaden the scope of article I, section 9 by stating that a grant of immunity must "place[ ] [the witness] in the same position as if he remained silent." The Supreme Court has rejected this formulation of the self-incrimination guarantee, instead favoring an interpretation similar to the one stated above. *See United States v. Apfelbaum,* 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250

(1980). This formulation also begs a very important question: put in the same position with respect to *what interest?* Clearly certain interests, such as keeping the compelled testimony from coming to public light, could not be achieved without implementing extraordinary means. The standard "the same position as if he remained silent" must have a *specific* reference point. In the present case, that reference point is incrimination. Thus, a meaningful reading of the "same position" argument is that the person compelled to testify must be put in the same position with regard to the possibility of incrimination as if he had remained silent. If the person had remained silent, he would have faced no hazard of incrimination *from his own words.* Thus, DeGrasse's seemingly restrictive standard really reduces to this court's prior standard: remove the hazard of incrimination due to the compelled person's own words.

all the relevant evidence will obviously be in the hands of the government—the government whose investigation included compelling the individual involved to incriminate himself.... [T]his argument does not depend upon assumptions of misconduct or collusion among government officers. It assumes only the normal margin of human fallibility. [People] working in the same office or department exchange information without recording carefully how they obtained certain information; it is often impossible to remember in retrospect how or when or from whom information was obtained. *Id.* at 568, 91 S.Ct. at 530–531; *see also Kastigar,* 406 U.S. at 469, 92 S.Ct. at 1669 (Marshall, J., dissenting).

For this important reason, we also reject the state's proffered analogy between compelled testimony and coerced confessions. In a case involving a coerced confession, the facts relevant to the "voluntariness" of the confession will be known and available to *both* the state and the accused. In the case of compelled testimony, however, the accused can only speculate as to how widely her compelled statement has been disseminated. Procedures and safeguards can be implemented, such as isolating the prosecution team or certifying the state's evidence before trial, but the accused often will not adequately be able to probe and test the state's adherence to such safeguards. This danger does not subside in the face of even the strictest burden of proof, for, as Justice Thurgood Marshall aptly noted, although the government may have the burden of proof, "the government will have no difficulty in meeting its burden by mere assertion if the witness produces no contrary evidence." *Kastigar,* 406 U.S. at 469, 92 S.Ct. at 1669 (Marshall, J., dissenting).

One of the more notorious recent immunity cases, *United States v. North,* 910 F.2d 843 (D.C.Cir.), *modified,* 920 F.2d 940 (D.C.Cir.1990) (en banc), *cert. denied,* —— U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991), illustrates another proof problem posed by use and derivative use immunity. *North* involved the criminal conviction of Oliver North for his alleged participation in the Iran/Contra Affair. Prior to his criminal trial, North had been compelled to testify before congressional committees investigating the Iran/Contra Affair. This testimony received extensive coverage in the national media. As required by federal law, North received immunity from use or derivative use of any testimony given before the committees.

On appeal, the District of Columbia Circuit identified two witness-related problems with regard to North's compelled testimony. First, the prosecution could use the compelled testimony to refresh the recollection of a witness testifying at North's criminal trial. *Id.* at 860–61. This use could be policed by relying on the good faith assurances of the prosecution and its witnesses that no such use was made of the compelled testimony. The second problem, however, is more troublesome. In a case such as *North,* where the compelled testimony receives significant publicity, witnesses receive casual exposure to the substance of the compelled testimony through the media or otherwise. *Id.* at 863. In such cases, a court would face the insurmountable task of determining the extent and degree to which "the witnesses' testimony may have been shaped, altered, or affected by the immunized testimony." *Id.* We have not been persuaded that procedures exist to probe the mind of a witness in order to discover such use of compelled testimony.

The second basis for our decision is that the state cannot meaningfully safeguard against nonevidentiary use of compelled testimony.[5] Nonevidentiary use "in-

---

5. Although both courts and commentators divide on whether a constitutional protection against self-incrimination should prohibit nonevidentiary use of compelled testimony, *see, e.g., United States v. Byrd,* 765 F.2d 1524, 1530–31 (11th Cir.1985) (allowing nonevidentiary use); *United States v. McDaniel,* 482 F.2d 305, 311 (8th Cir.1973) (prohibiting nonevidentiary use); Gary S. Humble, *Nonevidentiary Use of Compelled Testimony: Beyond the Fifth Amendment,* 66 Tex.L.Rev. 351, 371–83 (1987) (urging that nonevidentiary use be allowed); Kristine Strachan, *Self-Incrimination, Immunity, and Watergate,* 56 Tex.L.Rev. 791, 806–10 (1978) (urging

clude[s] assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea-bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy." *United States v. McDaniel*, 482 F.2d 305, 311 (8th Cir.1973). Innumerable people could come into contact with the compelled testimony, either through official duties or, in a particularly notorious case, through the media.[6] Once persons come into contact with the compelled testimony they are incurably tainted for nonevidentiary purposes. *See id.* Safeguarding against such dangers will prove well nigh impossible,

> [f]or the paths of information through the investigative bureaucracy may well be long and winding, and even a prosecutor acting in the best of faith cannot be certain that somewhere in the depths of his investigative apparatus, often including hundreds of employees, there was not some prohibited use of the compelled testimony.

*Kastigar*, 406 U.S. at 469, 92 S.Ct. at 1669 (Marshall, J., dissenting).

Nonevidentiary use of compelled testimony can adversely affect an accused in many ways. When compelled testimony is incriminating, the prosecution can "focus its investigation on the witness to the exclusion of other suspects, thereby working an advantageous reallocation of the government's financial resources and personnel." Strachan, *supra,* at 807. The compelled testimony "may help explain information otherwise known," which could aid the prosecution in the presentation of its case. *Id.* With knowledge of how the crime occurred, the prosecution may refine its trial strategy to "probe certain topics more extensively and fruitfully than otherwise." *Id.* Indeed, a defendant may choose to relinquish her right to testify out of fear

that the prosecution has honed its cross-examination with its knowledge of the compelled testimony. *Id.* Regardless of whether Jill Jahnke–Leland testified at her first trial, the prosecution's mere knowledge of her compelled testimony might significantly alter her decision whether to do so in a possible retrial. These are only some of the possible nonevidentiary advantages the prosecution could reap by virtue of its knowledge of compelled testimony.

Even the state's utmost good faith is not an adequate assurance against nonevidentiary uses because there may be "non-evidentiary uses of which even the prosecutor might not be consciously aware." *State v. Soriano*, 68 Or.App. 642, 684 P.2d 1220, 1234 (1984) (only transactional immunity can protect state constitutional guarantee against nonevidentiary use of compelled testimony). We sympathize with the Eighth Circuit's lament in *McDaniel* that "we cannot escape the conclusion that the [compelled] testimony could not be wholly obliterated from the prosecutor's mind in his preparation and trial of the case." *McDaniel*, 482 F.2d at 312. This incurable inability to adequately prevent or detect nonevidentiary use, standing alone, presents a fatal constitutional flaw in use and derivative use immunity.

We are not alone in construing a state constitutional guarantee to require transactional immunity in exchange for compelled incriminating testimony. Courts in Hawaii, Massachusetts, and Oregon have reached the same result. *See State v. Miyasaki*, 62 Haw. 269, 614 P.2d 915, 922–23 (1980); *Attorney General v. Colleton*, 387 Mass. 790, 444 N.E.2d 915, 921 (1982); *Soriano*, 684 P.2d at 1232.[7] In each case, the court relied, in part or in whole, on dangers presented by the inability to adequately enforce a ban on derivative use. *See Miya-*

---

that nonevidentiary use be prohibited), the state concedes that the Alaska Constitution prohibits such use. Additionally, we believe that nonevidentiary use could "furnish a link in the chain of evidence leading to a conviction," *E.L.L.*, 572 P.2d at 788, or at least forge and shape that chain, sufficiently to fall within the conduct prohibited by article I, section 9.

**6.** This situation is further complicated if potential jurors are exposed to the witness' compelled testimony through wide dissemination in the media.

**7.** *But see, e.g., State v. Strong,* 110 N.J. 583, 542 A.2d 866, 871–72 (1988); *People v. Johnson,* 133 Misc.2d 721, 507 N.Y.S.2d 791, 793 (Sup.1986); *Welsh v. Commonwealth,* 14 Va.App. 300, 416 S.E.2d 451, 455 (1992).

*saki*, 614 P.2d at 923–24; *Colleton*, 444 N.E.2d at 920–21; *Soriano*, 684 P.2d at 1233–34.

Because of the manifold practical problems in enforcing use and derivative use immunity we cannot conclude that AS 12.-50.101 is constitutional. Mindful of Edward Coke's caution that "it is the worst oppression, that is done by colour of justice," [8] we conclude that use and derivative use immunity is constitutionally infirm.

AFFIRMED.

8. 1 Lord Edward Coke, *The Second Part of the* *Institutes of the Laws of England* 48 (1797).