Bouldin, J.,
delivered the opinion of the court.
Doctor J. S. Dorsay Cullen was sent before the grand jury of the Hustings court of the city of Richmond to ' give evidence on behalf of the Commonwealth on au indictment charging John S. Meredith, William L. Royall, William R. Trigg and William B. Tabb with the murder of John B. Mordecai, as principals, in the second degree, and accessories before the fact, the actual killing being charged to have been accomplished by W. Page McCarty. When Dr. Cullen appeared before the grand jury the following question was propounded to him: “ State all you know in regard to a duel alleged to have taken place on the 9th day of May last, near Oakwood, between W. Page McCarty and John B. Mordecai?” Dr. Cullen declined to make any disclosure on the subject to the grand jury, saying to them in substance as follows: ■“I must decline to answer the question because my answer thereto will criminate myself.” The witness was then brought before the Hustings court, and still insisting on his right to decline to answer, that court, after hearing testimony, ordered the witness to answer the question. He again declined for the reason already stated; whereupon the Hustings court adjudged him guilty of a contempt, imposed on him a fine of fifty dollars, and ordered him to be imprisoned for one day.
To that judgment Dr. Cullen applied for and obtained a writ of error and supersedeas from one of the judges of this court, on which the case is now before us. The question is, was Dr. Cullen guilty of a contempt of the Hustings court in refusing, for the reason stated by him, to make the disclosure called for by the grand jury and ordered by the court?
It is insisted by his counsel that he was not, because he *627 has a right guarantied by the Constitution of the State, of which neither legislature nor courts can deprive him, to refuse to answer any question, the answer to which would tend to criminate him; and such it is contended would be the effect of an answer to the interrogatory propounded. Is there such constitutional right ?
The right to refuse to answer such questions before any judicial tribunal was the well-3ettled law of England long before the separation of the American colonies from the mother country; but the State of Virginia, ever foremost in proclaiming principles of personal liberty and security, -and providing safeguards to individual rights, was unwilling, when she assumed the attitude of an independent and sovereign State, to leave this great principle and -others of kindred character subject, as at common law, to the mutations of legislative will or to the hazard of judicial discretion. She therefore thought proper, as far back as June 12th, 1776, and prior to the declaration of independence, when forming her own State Constitution, to make a solemn declaration of the rights of the good people of Virginia, “which rights do pertain to them and their posterity as the basis and foundation of government.” And we find that by the 8th section of that declaration it is provided as follows:
“ That in all capital or criminal -prosecutions, a man hath a right to demand the cause and nature of his accusation, to be confronted with the accusers and witnesses, to eall for evidence in his favor, and to a speedy trial by .an impartial j ury of his vicinage, without whose unanimous consent he cannot be found guilty; nor can he be -COMPELLED TO GIVE EVIDENCE AGAINST HIMSELF; that no man be deprived of his liberty, except by the law of the land or the judgment of his peers.”
This section was framed nearly one hundred years .ago by “men of the days gone by.” It was framed for *628 the protection of the citizen, and announced great principles of individual right, to be secured to the people of Virginia and their posterity forever; and it stands to this day, untouched in word, syllable or letter, a part of our State Constitution, and a bulwark andsafeguard to the citizen, having for near .a century withstood the shock of revolution and the rage of innovation. The earnest and eminently wise and practical men who framed that declaration, certainly meant something when they solemnly declared that a man shall not be compelled to give evidence against himself. They were not issuing a mere brutum fulmen. On the contrary we think that it was their purpose to proclaim and render inviolable a great practical individual right — to declare as part of the organic law, that no man should anywhere, before any tribunal, in any proceeding, be compelled to give evidence tending to criminate himself, either in that or any other proceeding: in other words, to make the common law thus extended to all cases — parliamentary as well as judicial — a part of the oi’ganic law of the State: and we think it would be unjust to the men who framed and to the men who have so long preserved intact that important provision, were we to confine it only to cases in which a man is called on to give evidence against himself in a prosecution pending against him. This would indeed .be to dwarf the spirit and meaning of a great principle to the most insignificant proportions, and would scarcely be in character with the earnest, wise and practical men who proclaimed it. They certainly would scarcely have thought it necessaiy to guard in their oi’ganic law against an evil which had occurred in no civilized community within the memoiy of men then living, and at the same time to leave to the mutations of legislative will the protection of the citizen from being compelled to give evidence against himself in proceedings against *629 others — an evil of a very practical character, and leading directly to the same result: self-accusation. "We do not feel warranted in giving any such narrow and restricted construction to this declaration. It would render the provision wholly nugatory; and we do not think it is required, as has been contended, by the grammatical structure of the section. The portion of that section immediately preceding this important provision does, a3 must be •conceded, refer to proceedings in a pending prosecution, .and declares the rights of the accused in such prosecution ; commencing with the arraignment, and declaring his rights down to the verdict of the jury; each separate •declaration of a right being separated from the others by a comma merely, until, after providing against conviction without a unanimous verdict, the close of that portion of the section is indicated by a semi-colon. Then ■follows the broader declaration, now under consideration : “ if or shall he” (that is “a man,” for it was the rights of man which the men of ’76 were proclaiming,) •“ be compelled to give evidence against himself,” commencing after and followed by a semi-colon; thus affirming, as a distinct and fundamental right, that “a man” shall not be compelled to criminate or accuse himself. Had it been the purpose of the framers of the bill of xights to confine that declaration to a man’s rights when under trial, the rules of grammar and logic would have required its insertion in the body of the preceding sentence, and before the legitimate close of that sentence, providing against conviction without a unanimous verdict. The sentence had already provided for evidence for and against the accused, and had reached final verdict ; and as evidence always precedes and never follows the verdict, neither strict grammar nor sound logic would require that this independent, broad and compre *630 hensive declaration should be read and construed as part of the preceding sentence.
But were this otherwise — were it, in fact, obvious that the primary and strictly grammatical sense of the words and structure of the sentence would lead to the restricted construction contended for, yet, when we consider the-time and circumstances under which that declaration was promulged, and the character and purposes of the-men who made it, we revolt instinctively from a conclusion “so lame and impotent,” and are of opinion that it was intended to be and is, in effect, a complete protection to the citizen against self-accusation — a broad and catholic declaration that he shall not, before any tribunal or in any proceeding, be compelled to give evidence which, on a prosecution against himself, would tend to criminate him; and of this protection, in a proper case for its-application, he cannot be deprived by legislation.
We are fortified in the liberal construction we have given to this declaration, by the form in which the same-principle was affirmed by the constitutions of other States, which followed in the wake of Virginia, and made-her bill of rights the basis of their own.
Massachusetts, who at that early day evinced a generous rivalry of Virginia in her efforts to declare and vindicate the “rights of man,” announced the principle as follows: “No subject ‘shall’ be compelled to accuse or furnish evidence against himself; ” evidently giving to Virginia’s declaration the broad construction adopted by this-court.
The ninth section of the first bill of rights of Pennsylvania, promulged soon after our own, is a substantial' and almost literal copy of our eighth section, but with this difference, that the clause under consideration, which-is a literal copy of ours, follows a colon, instead of a, *631 semi-colon; is followed by a colon instead of a semicolon, and commences with a capital letter, thus Hop shall he ” (a man) “ be compelled to give evidence against himself;” and the next and concluding clause is also a literal copy of our own, except that it begins with a capital letter also, and in lieu of the words “that no man be deprived,” it uses the words “Hor can any man be justly deprived, &c.; ” evidently showing thatthe two last clauses ■were considered as announcing general and independent propositions.
Delaware, after announcing as the fourteenth section of her bill of rights so much of our eighth section as precedes the clause under consideration, in almost the same words makes a distinct section of the principle announced in that clause, slightly modified as follows, viz:
“15. That no man in the courts of common law ought to be compelled to give evidence against himself.”
Maryland divided our eighth section into three separate sections — nineteenth, twentieth and twenty-first— corresponding in substance with the three separate clauses of our eighth section.
The twentieth section is as follows :
“ 20. That no man ought to be compelled to give evidence against himself in a court of common law, or in any other court, but in such cases as have been usually practiced in this State, or may hereafter be directed by the legislature.”
We have referred to these several declarations made in the revolutionary era, and very soon after Virginia’s, as showing the cotemporaneous construction of her declaration by the conventions of other States, all showing that the principle secured by the declaration was announced as a separate and general right.
We have been pointed to the judicial decisions of but two States, Massachusetts and New York, on the ques *632 tion before ns; and our conclusions are sustained by the Supreme courts of both States. Emory's case, 107 Mass. R., 172, and the People v. Kelley, 24 New York, p. 74.
The terms of the Yew York constitution are far more restricted than our own. They are as follows: “that no person shall be compelled, in any criminal case, to be a loitness against himself; ” and the argument as to the grammatical sense of the clause was earnestly pressed upon the court.
Judge Denio said, p. 81: “The primary and most obvious sense of the mandate is, that a person prosecuted for a crime shall not be compelled to give evidence on behalf of the prosecution against himself in that case.” But notwithstanding this impression of the j udge as to “ the primary and most obvious sense of the mandate,” he takes no such narrow and restricted view of this grave constitutional safeguard. On the contrary he goes on to say:
“ But there is great force in the argument that constitutional provisions, devised against governmental oppressions, and especially such as may be exercised under the pretence of judicial power, ought to be construed with the utmost liberality, and to be extended so as to accomplish the full object which the author apparently had in view, so far as it can be done consistently with any fair interpretation of the language employed. The mandate that an accused person should not be compelled to give evidence against himself, would fail to secure the whole object intended if a prosecutor might call an accomplice or confederate in a criminal offence, and afterwards use the evidence he might give to procure a conviction on the trial of an indictment against him. If obliged to testify on the trial of the co-offender, to matters which would show his own complicity, it might be said upon a *633 liberal construction of the language that he was com- . . pelled to give evidence against himself ; that is, to give evidence which might be used in a criminal case ° ° himself.” People v. Kelley, 24 N. Y. R., p. 82.
And in closing the view of the court on this branch of the case, he says: “ It is of course competent for the legislature to change any doctrine of the common law; but I think they could not compel a witness to testify, on the trial of another person, to facts which would prove himself guilty of a crime without indemnifying him against the consequences, because, I think, as has been mentioned, that by a legal construction, the Constitution would be found to forbid it.” Ibid, p. 83.
"We approve the reasoning and results of Judge Denio’s opinion, and will add that if such a conclusion ■can be sustained under the very restricted terms of the Yew York Constitution, a fortiori is it proper under the much broader and comprehensive terms of our bill of rights?
This important privilege being thus guaranteed to the citizen by the Constitution, the next question is, is the case before us a proper one for its exercise ?
It is contended by the attorney-general that it is not, because, by the act of October 11th, 1870, entitled “an act to amend and re-enact section 1, chap. 12, of the Code of Virginia, (1860) with regard to duelling,” it is enacted, among other things, as follows: “ Every person who may have been the bearer of such challenge or acceptance, or otherwise engaged or concerned in any duel, may be required in any prosecution against any person but himself, for having fought or aided or abetted in such duel, to testify as a witness in such prosecution; but any statement made by such person, as such witness, shall not be used against him in any prosecution against him *634 self.” And it is insisted by the attorney-general that the testimony of no such witness can tend to criminate himself, because no statement made by him can be used as-evidence against him in any prosecution against himself.
Ve sympathise fully with the legislature in their efforts-to suppress the barbarous and anti-Christian practice of' duelling. Having its origin in false pride and a mistaken sense of honor, and upheld and sanctioned to a certain extent by a vicious public sentiment, the practice-has lingered in the Southern States much longer than it should have done, although condemned alike by the laws-of God and man ; and notwithstanding it has cost our country the lives of some of her noblest sons. "We-would gladly see it forever banished from our land. The practice is cruel in the extreme, and is founded neither in morals nor in reason, nor in common sense. It has-been well and truly said that it proves nothing, except that the parties, as is commonly the case with male animals, are willing to fight. It not unfrequently results in the-death of one or both of the combatants, and the question which called them to the field of honor (so called) remains-unsettled and is adjourned forever, leaving, quite as often, as otherwise, the injured party the victim and the wrongdoer triumphant. Nothing could be more unsatisfactory and unreasonable, and, as we have already said, we sympathise fully with the legislature in their efforts to suppress so baneful a practice. But we should ever be careful, whilst endeavoring to suppress a great evil, that' we do not ourselves fall into the error of committing a great wrong; not to do wrong that good may-come of it; not to invade the constitutional right of the the citizen. ’We are very reluctantly drawn to the conclusion that such is the effect of the act in question;. that it would deprive the witness of his constitutional *635 right to refuse to give evidence tending to criminate himself without indemnity, and is therefore to that extent unconstitutional and void.
The privilege claimed in this case is one, as we have seen, which was not only allowed hy the courts, but which for near a century has been carefully guaranteed by the Constitution. Whether such constitutional privilege can be taken away by the legislature at all, on any terms of indemnity, is a question not necessary to be now decided. But we are all clearly of opinion that before it can be taken away there must be absolute indemnity provided, and that nothing short of complete amnesty to the witness — an absolute wiping out of the offence as to him, so that he can no longer be prosecuted for it — will furnish that indemnity. We do not think the act of assembly referred to furnishes such indemnity. It only provides that the “statement” made by the witness shall not be used against him in a ¡prosecution against himself. How, it is apparent that, without using one word of that statement, the attorney for the Commonwealth might in many cases, and in a case like the present inevitably would, be led by the testimony of the-witness to means and sources .of information which might result in criminating himself. This would be to deprive him of his privilege without indemnity.
We are of opinion, therefore, that the act of assembly aforesaid, failing to afford complete indemnity, does not deprive the plaintiff in error of his constitutional privilege.
But it is further contended that the plaintiff in error was not entitled to claim the privilege in this case, because the court could see from the testimony that his answer to the question propounded would not tend tocriminate him at all. Without deciding whether in this case it was or was not proper for the court to go into- *636 other testimony than the statement of the witness himself to ascertain whether he was entitled to the privilege claimed or not, this court is well satisfied on that testimony that it was a proper case for the witness to claim his privilege; that the disclosure called for by the interrogatoi’y pi’opounded would tend to criminate him. "Without prejudging the question of guilt or innocence on the facts set out, it will suffice for us to say that there is enough in the settled principles of the common law, and in the statutes against duelling, to lead to the apprehension, at least, that the sui’geon of the party to a duel would be regarded in law as being concerned in, or as aiding and abetting the duel; and we are further of opinion, that there is enough in the testimony to justify Dr. Cullen in the apprehension that a full disclosure of the facts by him would tend to show that, knowing a duel was to be fought near Oakwood, he attended at that place at the instance of one of the parties, to be ready to render his professional services as surgeon to one or both of them, should they be requii’ed; that the duel was in fact fought; and that his services as sui’geon were required and rendered. Such testimony, we think, might tend to criminate the witness, and we are of opinion that he should not have been compelled to make the •disclosure, unless for some other reason he had lost his privilege of refusal.
Dut it has been earnestly argued that this is not a proper case to recognize the privilege, because the witness "lias already made elsewhere a full and voluntary disclosure of the facts, and that nothing he could now say would do more to criminate him than has been done .already by that statement. Conceding this to be so, we are by no means prepared to say that it answers the ■claim of the witness to his pi’ivilege. If, as we have "held to be the case, a full disclosure of the facts might *637 tend to criminate the witness, we cannot see how that tendency is at all removed by showing that the witness had elsewhere made a statement tending to him. The question before us is not what the witness may have said elsewhere; but whether, when it is apparent that a disclosure from him may tend to criminate him, he shall now, in a pending trial, be compelled to make that disclosure, although he claims his constitutional right of refusal. We do not see that his statements elsewhere have auything to do wfith the question. They are matters of fact wholly collateral, on which issues might be taken.
But however that may be, it is utterly impossible for any court to know in advance what additional facts, tending to criminate the witness, might not be elicited by a rigid and searching examination by learned counsel. Indeed, a mere repetition on oath of .the same facts would of itself, as corroborative evidence, tend to criminate him; and we think it would be equivalent to a denial of the privilege altogether to expose the witness to the hazard of such examination.
It is contended in the last place that the witness has lost his privilege by waiver; that he has already made a full and voluntary disclosure of the facts before the coroner when holding an inquest over the dead body of the deceased, and was thereby precluded from thereafter asserting his privilege of refusal to answer.
We entertain no doubts that a witness may waive his privilege, whether secured to him by the Constitution or otherwise, on the familiar principle that a man may always waive a provision made for his benefit. But the waiver of such a privilege as we are now considering, must always be made understanding^ and willingly, and generally after being fully warned by the court. In 1 Greenleaf Ev., § 451, we are told that whether the *638 testimony will tend to criminate the witness or not is a point on which the court is bound to instruct him. And the author goes on to say in the same section: “But in all cases where the witness, after being advertised of his ’privilege, chooses to answer, he is bound to answer everything relative to the transaction.” Without “ being advertised of his privilege,” the witness evidently would not, in the estimation of the learned author, be held as waiving his privilege. The authorities referred to by Mr. Greenleaf, and those commented on at the bar, fully sustain the position that, as a general rule, the witness should be warned as to his privilege before he can be held to have waived it by answering. This is the rule when the answers have been made in the case before the court. It would apply “a fortiori” to a case like this, where the supposed waiver was not made before a court but before a coroner in the country, and when the witness made his statement without being advertised of his privilege “ inops consilii,” and evidently without appreciating the position in which he was placed. Without deciding that a witness can be held in any case to have waived his privilege by answering before a different tribunal, we are clearly of opinion that there has been no such waiver in this case.
The result is, that in refusing to answer the interrogatory propounded, Dr. Cullen was exercising a privilege secured to him by the Constitution, and was not guilty of a contempt of court.
Judgment of Hustings court reversed and cause remanded, with instructions to allow the witness his privilege of declining to make the disclosure called for, if insisted on by him.
Moncure, P., dissented.
.Judgment reversed.