**In the Matter of the Grand Jury Testimony of Joanne KINOY.**

**No. M–11–188.**

United States District Court,
S. D. New York.

Jan. 29, 1971.

Whitney North Seymour, Jr., U. S. Atty., Peter L. Truebner, John H. Doyle,

III, David M. Brodsky, Asst. U. S. Attys., New York City, Herbert O. Reid, Sr., John Lowenthal, Newark, N. J., Morton Stavis, James Reif, Arthur Kinoy, Charles Fishman, c/o Center for Constitutional Rights, Lubell, Lubell, Fine & Schaap, New York City, for Joanne Kinoy.

## OPINION

MOTLEY, District Judge.

This matter is before this court on the application of the Government for an order directing Joanne Kinoy to answer questions before a federal grand jury under a grant of immunity conferred by Title II of the Organized Crime Control Act of 1970. 18 U.S.C. §§ 6001–6003.

On January 11, 1971 an Assistant United States Attorney applied to this court for the order. It would compel Miss Kinoy to "give testimony and provide other information as defined in 18 U.S.C. § 6001(2) with respect to the whereabouts, places of residence, activities, acquaintances, habits and customs of" two named individuals. The proposed order further declares that "no testimony or other information compelled under the order, or any information directly or indirectly derived from such testimony or other information, may be used against Joanne Kinoy in any criminal case. * * * "

Along with the proposed order, the Assistant United States Attorney submitted his affidavit setting forth the subjects being investigated by the grand jury and stating that Miss Kinoy had refused, on the basis of her privilege against self-incrimination, to testify regarding the matters being investigated. Also submitted was a copy of a telegram from the Assistant Attorney General in Washington, D. C. authorizing the United States Attorney to seek a grant of immunity pursuant to the provisions of 18 U.S.C. § 6003 in the event Joanne Kinoy asserted her privilege against self-incrimination.

At first, the Government asserted that the order could be signed *ex parte*. Although the court was inclined to disagree with the Government, In re Bart, 113 U.S.App.D.C. 54, 304 F.2d 631 (1962), a decision on the issue was unnecessary in view of the Government's voluntarily serving Miss Kinoy with the relevant papers, and the Government's failure to press the point.

Miss Kinoy, by her attorneys, asserts that both the procedures followed by the Government and the relevant provisions of the Act are defective in a number of respects.

Briefly summarized these asserted defects are the following: 1) that the court is being asked to grant the witness prospective immunity, i. e., immunity in the future, which it cannot constitutionally do; 2) that the order's specification of only the subjects of inquiry and the failure of the order to specify the questions the witness is required to answer, violates the notice requirements of the Due Process Clause; 3) that the testimony sought before the grand jury is not in furtherance of a legitimate grand jury investigation; 4) that the immunity granted her by the statute is unconstitutional because it is not coextensive with her privilege against self-incrimination.

The facts relevant to a decision of these issues can be briefly summarized as follows: On December 31, 1970, Joanne Kinoy was served with a subpoena requiring her immediate appearance before the grand jury. This subpoena was continued until after a hearing that day in Kinoy v. Mitchell, 70 Civ. 5698 (S.D. N.Y. Dec. 31, 1970) [1] and, then, because

---

I. Kinoy v. Mitchell, supra, is a civil rights damage action brought by Arthur Kinoy and Joanne Kinoy, his daughter, against various members of the Department of Justice. Plaintiffs in that suit assert they are being harassed by the defendants. Prior to the commencement of that suit Arthur Kinoy moved to quash a subpoena requiring his attendance before the grand jury His motion was denied. In the Matter of a Grand Jury Subpoena Served Upon Arthur Kinoy, D.C., 326 F. Supp. 400 (1970).

the grand jury had gone home, until the following Monday, January 4, 1971. On January 4, 1971 Miss Kinoy appeared before the December regular grand jury and refused to answer, on the ground of her privilege against self-incrimination, a number of questions regarding the two individuals named in the proposed order. After this questioning, Miss Kinoy was excused by the foreman and told to report back to the same grand jury room in one week.

On January 11, 1971 she reported back to the same grand jury room, but the December grand jury that previously had heard her testimony was not present. She was told that the December grand jury had been excused *sine die* and that she was now before a new grand jury, the January regular grand jury.

## I.  *Prospective Immunity*

Miss Kinoy's first claim is grounded on her assertion that, at the present time, she is not subject to a valid grand jury subpoena, and on the fact that the order does not specify the questions she will be compelled to answer. These facts, taken together, she argues, make any action by this court on the proposed order wholly prospective. While her lawyers do not tell the court why a prospective order might be unlawful, the court assumes that the witness is arguing that the Government's application for an order does not present this court with a "case or controversy" as required by Article III of the United States Constitution.

Miss Kinoy recognizes, of course, that the statute authorizing the Government's application allows for a wholly prospective grant of immunity.  (18 U.S.C. §

6003).  The witness need not be, at the time of the application, under a grand jury subpoena, nor need she have been asked a single question.  However, Miss Kinoy asserts that insofar as the statute authorizes wholly prospective immunity it is unconstitutional.  The court finds, however, that the situation contemplated in the statute, a grant of wholly prospective immunity, is not presented in the circumstances of this case.

Miss Kinoy argues that the grand jury subpoena served on her December 31, 1970 is no longer of any force and effect because the December grand jury, before which she refused to answer questions, has been "discharged."  Miss Kinoy is mistaken in her belief that the December grand jury has been "discharged," it has rather been excused *sine die*.  The court takes judicial notice of the fact that a regular grand jury in the Southern District of New York usually sits for a period of only thirty (30) days and is often excused *sine die*.  Moreover, by law, Fed.R.Crim.P. 6(g), the life of a grand jury extends for a period of eighteen (18) months.  Thus, the subpoena is still in effect.[2]

Miss Kinoy further argues that as only the subject matter of the questions is stated in the proposed order it is not known at this time what questions she will be asked.  The court finds this argument frivolous.  From a reading of the December grand jury minutes of January 11, 1970 it is clear that Miss Kinoy properly relied on her Fifth Amendment privilege in response to a number of questions regarding the very subject matter set forth in the Government's order.

2.  Miss Kinoy, subpoenaed to appear before the December regular grand jury, testified and properly invoked the privilege before that grand jury.  After she testified, the foreman of the December regular grand jury adjourned her subpoena and when she reappeared, she was in front of a new grand jury, the January regular grand jury.

The December regular grand jury, as the Government admitted, has not yet been discharged.  It has, as noted, a poten-

tial life of eighteen (18) months.  Fed. R.Crim.P. 6(g).  The Government could not give the court an adequate reason as to why Miss Kinoy was required to continue her testimony before a different grand jury.  In the court's view, orderly procedure requires that once a witness, under these circumstances, has begun testifying about a matter before one grand jury, the witness should be allowed to finish his testimony about that matter before the same grand jury.

■ The court's findings that Miss Kinoy is still subject to a grand jury subpoena, and that she has refused to answer, on Fifth Amendment grounds, questions relating to the subject matter set forth in the proposed order, clearly indicate that the Government's application for an order of immunity is not prospective but presents this court with an actual controversy as required by Article III.

## II. *Due Process*

The witness claims that the proposed order, in delineating only the subject matter of the questions and not the questions themselves, is violative of due process in that she was unable to reasonably ascertain the conduct proscribed. Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926). She asserts that the proposed order places her in the untenable position of having to guess whether or not a question is related to the subject matter of the order. If she thinks it is not related and refuses to answer, she may be held in contempt if a court later determines it is related. If she thinks it is related to the subject matter of the order and answers the question, she may have incriminated herself without the protection of immunity, if a court later determines it is unrelated.

■ The court agrees that the order would be violative of due process if the above described consequences flowed directly from it. But the proposed order does not subject the witness to such perils. If a witness is not sure whether or not a question is related to the subject matter of the order, he is entitled to a prior ruling from the court. Only after such a ruling and the witness' continued refusal to answer would the witness be subject to a citation for contempt. This procedure insures the witness that he will know in advance the conduct that is proscribed and guarantees that he will not inadvertently waive his privilege.

While the better procedure may be to delineate the questions in the order, *Cf.*

Corona v. United States, 250 F.2d 578 (6 Cir. 1958); Ullman v. United States, 128 F.Supp. 617 (S.D.N.Y.1955); United States v. Fitzgerald, 235 F.2d 453 (2 Cir. 1956), the procedure followed in this case to this point is not constitutionally offensive.

## III. *Improper Use of Grand Jury*

Judge Frankel has twice ruled against the claim that the grand jury in this case is not conducting a legitimate proceeding. *See* In the Matter of a Grand Jury Subpoena Served Upon Arthur Kinoy, *supra*; and Kinoy v. Mitchell, *supra*. The court agrees with Judge Frankel that the grand jury proceeding in this case is legitimate.

## IV. *Constitutionality of the Immunity Provision*

■ The witness has challenged the constitutionality of the new immunity law of the United States pursuant to which the Government seeks its order. The witness has standing to raise this issue. The court is being requested to order her to answer questions she has refused to answer and to give up her Fifth Amendment privilege against self-incrimination. Unless the immunity granted under the statute is coextensive with the privilege, the statute does not fully protect her, and she cannot be ordered to testify. The statute is being applied directly to her. Carter v. United States, 417 F.2d 384, 387 (9th Cir. 1969); Ullman v. United States, 128 F.Supp. 617 (S.D.N.Y.1955) (Weinfeld, J).

Although the law was enacted as a part of the Organized Crime Control Act of 1970 (Title II), it may be invoked in the case of any witness who refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before, or ancillary to, a court or grand jury of the United States. It may likewise be invoked in the case of a witness before an agency of the United States, either House of Congress, a joint committee of the two Houses, or a committee or a subcom-

mittee of either House. The instant case involves only a proceeding before a federal grand jury investigating alleged violations of a federal criminal statute.

The new law repeals or conforms over fifty existing federal immunity statutes.[3] A witness who invokes his privilege may not refuse to testify on that basis if the person presiding over the proceeding communicates to the witness an order, issued under the law, granting him the immunity provided for by the statute. The immunity provided is as follows: " * * * no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order." (18 U.S.C. § 6002).

The witness has challenged the constitutionality of this new law on the ground that the immunity it affords is not coextensive with her Fifth Amendment privilege against self-incrimination. The witness claims that in order to be deemed an adequate statutory replacement of her Fifth Amendment privilege, this new law must afford her not only the limited protection which it does provide against future use of the compelled testimony, and its fruits, but, in addition, it must afford her absolute immunity from future prosecution for the offense to which the questioning relates.

The witness relies upon the Supreme Court's decision in Counselman v. Hitch-

cock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892), the pivotal language of which follows:

"We are clearly of opinion that no statute which leaves the party or witness subject to prosecution after he answers the criminating question put to him can have the effect of supplanting the privilege conferred by the constitution of the United States. * * * In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates. * * * Section 860, moreover, affords no protection against that use of compelled testimony which consists in gaining therefrom a knowledge of the details of a crime, and of sources of information which may supply other means of convicting the witness or party." (*Id.* at 585–586, 12 S.Ct. at 206).

The witness urges upon this court that *Counselman* remains the law of the land and the controlling authority for determining the constitutionality of a federal immunity statute.

The immunity provided for by the new law is referred to as a use-restriction immunity. The additional immunity which the witness claims is constitutionally required is referred to as transactional immunity. There is no question that Congress, in enacting the new law, was aware of both the distinction and of the *Counselman* case and intended to afford only the use-restriction immunity.[4]

3. See amendment to table of parts for 18 U.S.C. § 6005.

4. "It is designed to reflect the use-restriction immunity concept of Murphy v. Waterfront Commission * * * 378 U.S. 52 [84 S.Ct. 1594, 12 L.Ed.2d 678] * * * (1964) rather than the transaction immunity concept of Counselman v. Hitchcock, 142 U.S. 547 [12 S.Ct. 195, 35 L.Ed. 1110] (1892)." House Report No. 91–1549, 91st Congress, 2nd Sess., p. 42; House Report No. 91–1188, 91st Congress, 2nd Sess., contained in 1970 U.S.Cong. & Admin.News pp. 4705, 4706; Senate Report No. 91–617, 91st Congress,

1st Sess., pp. 144–148; 116 Cong.Rec.H. 9605 (daily ed. Oct. 5, 1970); 116 Cong. Rec.H. 9743 (daily ed. Oct. 7, 1970); 116 Cong.Rec.S. 332–333 (daily ed. Jan. 21, 1970); 116 Cong.Rec.S. 422–423, 479, 481 (daily ed. Jan. 23, 1970); Hearings on S. 30 Before the Subcomm. on Criminal Laws and Procedures of the Comm. on the Judiciary, 91st Cong., 1st Sess., 285–286, 305–306 (1969).

The Supreme Court of New Jersey in In Re Zicarelli, 55 N.J. 249, 261 A.2d 129 (1970), jurisdictional statement filed sub nom. Zicarelli v. New Jersey Commission of Investigation, No. 91, October Term, 1970, has ruled that in accordance with

The Government contends that the immunity afforded by the new law is co-extensive with the witness' privilege, since the use-restriction immunity is all that is required by the Supreme Court's decision in *Counselman, supra*. In support of its contention the Government urges two grounds: The first is that the Court's language in *Counselman, supra*, at 585–586, 12 S.Ct. 195, upon which the witness predicates her claim to transactional immunity, is not a holding in the case but mere *dictum* or an advisory opinion to Congress and, therefore, not binding upon this court. The second is that if that language was a holding, it has been *sub silentio* overruled; or its validity has been so eroded by more recent Supreme Court rulings as to preclude a judgment by this court that the immunity provision here challenged is unconstitutional.

This court holds that *Counselman* is still the law, that it has not been *sub silentio* overruled or eroded by more recent opinions, that transactional immunity is constitutionally required as between the questioning sovereign and the witness, and that the immunity statute here challenged is, consequently, unconstitutional.

The first federal immunity statute was enacted in 1857 (11 Stat. 155–156) in aid of an investigation by the Congress into charges that some of its members were extorting money from private persons interested in legislation before it. The act provided that: " * * * no person examined and testifying before either House of Congress, or any committee of either House, shall be held to answer criminally in any court of justice, or subject [sic] to any penalty or forfeiture for any act or fact touching which he shall be required to testify * * * ".

Witnesses received their immunity simply by testifying before a congressional committee.[5] "Abuses in the form of 'immunity baths' occurred."[6] In 1862 Congress responded by repealing the statute and substituting therefor a statute which provided immunity only against the use of the testimony in any subsequent criminal proceeding against a congressional witness. This statute, which applied only to congressional proceedings, provided: " * * * the testimony of a witness examined and testifying before either House of Congress, or any committee of either House of Congress, shall not be used as evidence in any criminal proceeding against such witness in any court of justice * * * ."[7] The fruits of such testimony were not immunized and future prosecutions were not barred.

In *Counselman, supra*, the Court passed upon the validity of a similar immunity statute which provided only for immunity from the use of the testimony but not for immunity from the use of its fruits. Moreover, it failed to provide immunity from future prosecution. Counselman was convicted of contempt of court when he refused, on the ground of self-incrimination, to answer questions put to him during an investigation by a federal grand jury into alleged violations of the Interstate Commerce Act. The statute in *Counselman, supra*, provided: "no pleading of a party, nor any discovery or evidence obtained from a party or witness by means of a judicial proceeding in this or any foreign country, shall be given in evidence, or in any manner used against him or his property or estate, in any court of the United States, in any criminal proceeding, or for the enforcement of any penalty or forfeiture * * * ." (*Counselman, supra*, 142

the Supreme Court's decision in Murphy v. Waterfront Commission, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), the use-restriction immunity is all that is now required by the questioning sovereign.

5. Measures Relating to Organized Crime, Printed for Use of Committee on the

Judiciary, United States Senate, Hearings before the Subcommittee on Criminal Laws and Proceedings, 91st Congress, 1st Sess., p. 293.

6. Id.

7. 12 Stat. 333 (1862).

U.S. at 560–561, 12 S.Ct. at 197). This statute was first enacted in 1868.[8]

The circuit court had held that if Counselman was subsequently prosecuted for an offense about which he testified, the statute would bar efforts to prove his admissions. It had further ruled that "although in his testimony he [Counselman] might disclose facts and circumstances which would open up sources of information to the government, whereby it might obtain evidence not otherwise obtainable to secure his conviction, yet, if his testimony could not be repeated in any subsequent proceeding against him or his property, he was protected as fully by * * * [the immunity statute] as the constitution intended he should be." (*Counselman, supra*, at 560, 12 S.Ct. at 197).

The Supreme Court disagreed with this holding. It held that the statute was not coextensive because it did not bar future prosecution of the witness for an offense to which his testimony related. (*Id.* at 585–586, 12 S.Ct. 195). Before reaching its conclusion, the Court first noted that: "In some states, where there * * * [was] a like constitutional provision, it * * * [had] been attempted by legislation to remove the constitutional provision, by declaring that there shall be no future criminal prosecution against the witness, thus making it impossible for the criminal charge against him ever to come under the cognizance of any court, or at least enabling him to plead the statute in absolute bar of such prosecution." (*Id.* at 565, 12 S.Ct. at 199). The Court then undertook a review of adjudicated cases on the question of self-incrimination. It found that in Emery's Case, 107 Mass. 172 (1871), and in Cullen v. Commonwealth (Va.), 24 Gratt. 624 (1873), those two state courts had held, with respect to state immunity statutes similar to the one in *Counselman*, that a statute must completely bar future prosecution before it could be regarded as an adequate substitute for the privilege afforded by the constitutions of the particular state. It also found that in State v. Nowell, 58 N.H. 314 (1878) and in People v. Sharp, 107 N.Y. 427, 14 N.E. 319 (1887), that the state statutes there involved did bar future prosecution and were upheld as adequate substitutes for the state's constitutional privilege. In five other states the Court found that statutes similar to the one before it had been upheld as adequate. The Court, nevertheless, followed the apparent minority view. It expressed the belief that its view was supported by a prior leading decision of the Court which had discussed the interrelation of the Fourth and Fifth Amendments, Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), and an opinion by Chief Justice Marshall, then sitting in the Circuit Court of the United States for the District of Virginia in Burr's trial, 1 Burr's Trial 244 (1807), on the scope of the privilege.

The statute before the Court in *Counselman* plainly did not bar future prosecution. As the Court had pointed out initially (when it reached the question whether the statute adequately replaced the protection afforded by the privilege) the only thing the statute did was to bar the direct use of the witness' testimony. It did not bar its indirect use. (*Id.*, 142 U.S. at 564, 12 S.Ct. at 198–199). "It could not, and would not, prevent the use of his testimony to search out other testimony to be used in evidence against him or his property, in a criminal proceeding * * *." (*Id.*) "It could not prevent the obtaining and the use of witnesses and evidence which should be attributable directly to the testimony he might give under compulsion, and on which he might be convicted, when otherwise, and if he had refused to answer, he could not possibly have been convict-

---

8. 15 Stat. at L. 37. The 1862 statute, 12 Stat. 333, relating to congressional investigations was never repealed but held inadequate because it failed to provide for immunity from prosecution in Adams v. Maryland, 347 U.S. 179, 74 S.Ct. 442, 98 L.Ed. 608 (1954).

ed." (*Id.*) In short, the statute did not protect the witness from being compelled to be a witness against himself. And what the Court was simply saying at this point was that the statute did not even do what it purported to do, i. e., it did not actually protect the witness from the use of his testimony in a subsequent criminal proceeding.

After the *Counselman* case, Congress enacted, in 1893, in aid of Interstate Commerce Act investigations, an immunity statute which granted the "absolute "immunity" from future prosecution which the Court held in *Counselman* was required if the constitutional privilege is to be displaced. That statute provided: "But no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may testify, or produce evidence, documentary or otherwise, before said Commission, or in obedience to its subpoena, or either of them, or in any such case or proceeding." (27 Stat. 443). The power of Congress to replace the constitutional privilege by statute was sustained, in 1896, in Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896), when the 1893 Act first came before it. In *Brown*, the Court followed its reasoning in *Counselman* and sustained the 1893 statute's adequacy, because of its "absolute immunity" from future prosecution, as a replacement for the Fifth Amendment's privilege. Brown had been subpoenaed to testify before a federal grand jury just as Counselman had been and with respect to the same subject matter, i. e., alleged violations of the Interstate Commerce Act.[9] The Court pointedly observed that the then new immunity law had been enacted in response to its decision in *Counselman.* The Court, in its

opinion in *Brown*, then set forth what it called the "gist" of its decision in *Counselman.* In doing so, the Court quoted the precise language cited above with respect to the ineffectiveness of the old statute to bar the use of the fruits of compelled testimony and the language relied on by the witness to support her claim that any immunity statute must provide "absolute immunity" from future prosecution. (161 U.S. at 594, 16 S.Ct. 644).

If the "absolute immunity" from prosecution language in *Counselman* was mere *dictum*, it took on new life in Brown v. Walker, *supra*, as settled doctrine.[10] There the Court said that the self-incrimination clause of the Constitution was obviously susceptible of two interpretations. First, it can be construed literally as authorizing a witness to refuse to incriminate himself. Such a literal construction, the Court observed, would, in practical effect, mean that no one could be compelled to testify to a material fact in a criminal case unless he chose to do so, or unless it was entirely clear that the privilege was not set up in good faith. Secondly, the clause can be construed as being designed to bar a prosecution of a witness which might be aided directly or indirectly by his compelled disclosures. "[T]hen, if no such prosecution be possible,—in other words, if his testimony operate [sic] as a complete pardon for the offense to which it relates,—a statute absolutely securing to him such immunity from prosecution would satisfy the demands of the clause in question." (Brown v. Walker, *supra*, 161 U.S. at 595, 16 S.Ct. at 646). The Court felt that the latter interpretation should be adopted since the privilege undoubtedly was designed "to effect a practical and beneficent purpose,—not necessarily to

9. However, the Court found that the questions put to Brown would not tend to incriminate him because his position in the company was simply that of auditor of books and records rather than one with authority to make the prohibited contracts.

10. There were three new members of the Court when *Brown* was decided. Two of these new members dissented in *Brown* and were joined by two members of the *Counselman* court. These dissenters believed that there could be no legislative enactment by Congress replacing a constitutional right.

protect witnesses against every possible detriment which might happen to them from their testimony, nor to unduly impede, hinder, or obstruct the administration of criminal justice." (*Id.* at 596, 16 S.Ct. at 646).

The court noted certain exceptions to the privilege which it thought plainly demonstrated its purpose. For example, if the statute of limitations has run as to a crime, or if the witness has already received a pardon, such a witness may not invoke the privilege because, obviously, he cannot thereafter be prosecuted.

Finally, the Court recalled that the sacrosanct concept of a privilege against self-incrimination had its origins in the Seventeenth Century Englishmen's protest against the abuses of the inquisitorial system of justice and has since become the touchstone of our adversarial system. (*Id.* at 596–597, 16 S.Ct. 644); Malloy v. Hogan, 378 U.S. 1, 7, 9–10, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

The statute upheld in *Brown* as sufficiently broad to displace the constitutional privilege became the model for the numerous federal immunity statutes thereafter adopted and "has become part of our constitutional fabric." Ullman v. United States, 350 U.S. 422, 438, 76 S.Ct. 497, 506, 100 L.Ed. 511 (1956).

Those who claimed prior to 1956 that the Supreme Court's language in *Counselman,* upon which the witness relies, was mere *dictum* must have been surprised by the Court's opinion, directly on point, in Ullman v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956). The decision in *Ullman* was 7 to 2. Justices Douglas and Black dissented for the same reason that formed the basis of the dissents in Brown v. Walker, supra, i. e., that "the right of silence created by the Fifth Amendment is beyond the reach of Congress." (*Id.*

at 440, 76 S.Ct. at 507). The majority not only reaffirmed *Brown* (*Id.* at 429, 76 S.Ct. 497), which involved an immunity statute similar to the one before the Court in *Ullman,*[11] but said: "Four years previously in *Counselman,* * * *, a unanimous Court had found constitutionally inadequate the predecessor to the 1893 statute because the immunity granted was incomplete, in that it merely forbade the use of the testimony given and failed to protect a witness from future prosecution based on knowledge and sources of information obtained from the compelled testimony. It was with this background that the 1893 statute, providing complete immunity from prosecution, was passed and that *Brown* v. *Walker* was argued and decided." (*Id.* at 437, 76 S.Ct. at 505).

On the same day on which the Court held the Fifth Amendment privilege against self-incrimination applicable to the states, Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), it held that the privilege protects a state witness against incrimination under federal law (as well as state law) and a federal witness against incrimination under state law (as well as federal law). It then held that the federal government is prohibited from making any use of testimony, including its fruits, which a witness is compelled to give after a grant of state immunity. Murphy v. Waterfront Commission of New York, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

Petitioners in *Murphy* had been granted immunity from prosecution under state law but refused to testify on the ground that their answers might tend to incriminate them under federal law to which the grant of immunity did not purport to extend. The states, of course, are without power to grant immunity from federal prosecution but the federal government does have the power to grant

---

11. The statute in *Ullman* provided:
"But no such witness shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify or produce evidence, nor shall testimony so compelled be used as evidence in any criminal proceeding * * *." 68 Stat. 745, 18 U.S.C. § 3486.

immunity from state prosecution. Brown v. Walker, *supra*; Adams v. Maryland, 347 U.S. 179, 74 S.Ct. 442, 98 L.Ed. 608 (1954); Uniformed Sanitation Men Ass'n, Inc. v. Commissioner of Sanitation, 426 F.2d 619, 623 (2d Cir. 1970), pet. for cert. pending, No. 316, October Term 1970. The New Jersey Supreme Court had held that a state, although it was without power to grant immunity from federal prosecution could, nevertheless, constitutionally compel a witness to give testimony which might be used in a federal prosecution against him.

The United States Supreme Court said: "Since a grant of immunity is valid only if it is coextensive with the scope of the privilege against self-incrimination [citing *Counselman*], we must now decide the fundamental constitutional question of whether, absent an immunity provision, one jurisdiction in our federal structure may compel a witness to give testimony which might incriminate him under the laws of another jurisdiction. The answer to this question must depend, of course, on whether such an application of the privilege promotes or defeats its policies and purposes." (*Id.*, 378 U.S. at 54, 84 S.Ct. at 1596).

Again the Court, citing *Ullman, supra,* reviewed the great policies and purposes of the privilege and concluded that most of these are defeated when a witness "can be whipsawed into incriminating himself under both state and federal law even though" the constitutional privilege applies to both. (*Id.* at 55, 84 S.Ct. at 1597). The Court then overruled three of its prior decisions which had supported the conclusion reached by the New Jersey Supreme Court.

The Court next proceeded to a consideration of what effect its holding (that the privilege against self-incrimination protects a state witness against incrimination under federal as well as state law) would have on existing *state* immunity legislation. The New Jersey statute provided for immunity from fu-

ture state prosecution. It did not protect the witness from future federal prosecution or from federal use of the compelled testimony and its fruits. State immunity laws did not and could not protect a witness against federal prosecution or the use of compelled testimony by federal authorities. The Court, therefore, extended the Fifth Amendment's protection to federal authorities in such a situation and prohibited the use of such testimony and its fruits. *Murphy,* consequently, broadened rather than restricted the protection of the Fifth Amendment's privilege against self-incrimination. The reason the Court extended the protection of the privilege in a cross-jurisdiction situation only to use of the compelled testimony and its fruits and not to prosecution immunity was out of considerations of federalism. Thus it minimized interference with the law enforcement prerogatives of the non-questioning jurisdiction. The Court characterized this as an exclusionary rule. (*Id.* at 79, 84 S.Ct. 1594). The *Murphy* decision is, therefore, not properly cast as a *sub silentio* overruling of *Counselman's* transactional immunity requirement as between the questioning state and the witness. (*See* concurring opinion of Mr. Justice White in *Murphy,* 378 U.S. at 106, 84 S.Ct. 1594).

It cannot be doubted that the determination of the Congress to limit the immunity granted by the Organized Crime Control Act of 1970 to the use-restriction immunity was based upon the Court's opinion in *Murphy.*[12] And the *Murphy* opinion is relied upon by the Government for its claim that the transactional immunity requirement of *Counselman* has been *sub silentio* overruled. However, the fact that *Murphy* did not overrule *Counselman* was made clear a year later when the Court decided Albertson v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed. 2d 165 (1965). That case involved a federal immunity statute similar to the one in *Counselman,* i. e., one which protected

12. See footnote 4, *supra.*

only against the use of the testimony in evidence in a subsequent prosecution but did not bar future prosecution or the use of the fruits of the testimony. There the unanimous Court specifically reaffirmed the requirement of *Counselman* that an adequate immunity statute must afford "absolute immunity against future prosecution for the offense to which the question relates." It held that the immunity statute there did not meet this standard. It also condemned the fact that the statute did not even bar the use of the compelled written disclosure as an "investigatory lead." (*Id.* at 79–80, 86 S.Ct. 194).

In Stevens v. Marks, 383 U.S. 234, 86 S.Ct. 788, 15 L.Ed.2d 724 (1966), decided only about three months after *Albertson, supra,* the Court found no reason to reconsider *Counselman's* prosecution immunity requirement when the state is the questioning sovereignty. (*Id.* at 244–249, 86 S.Ct. 788). The Court's holding was that the petitioner police officer (who had been discharged from his position because he refused to waive his privilege and who was also convicted of contempt of court because he refused to answer questions on the ground that he had earlier waived his privilege) had never been told that he might obtain a valid immunity from prosecution. He could, therefore, withdraw his previous waiver of immunity (made shortly before the Court's decision in Malloy v. Hogan, *supra,* making the Fifth Amendment privilege applicable to the states) and then stand on his privilege, in the absence of clear knowledge of an immunity provision specifically applicable to him. But the concurring opinion indicated that the question whether a use-restriction immunity alone is sufficient as between the witness and the questioning sovereignty was not decided by *Murphy.*

In United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966), which followed, there was again no occasion for the Court to even mention *Counselman.* There the Government had advised defendant that he was to be prosecuted criminally for tax defalca-

tions. However, before formally indicting defendant the Government commenced a jeopardy tax assessment proceeding against defendant in which he filed an answer. When the criminal proceeding was finally instituted, defendant moved to dismiss it on the ground that the Government would be relying upon evidence obtained in violation of defendant's Fifth Amendment privilege. The trial court granted the motion. The Government argued that defendant had done no more than make general denials in the civil proceeding and had not thereby incriminated himself. The Supreme Court reversed. A unanimous Court said: "Even if we assume that the Government did acquire incriminating evidence in violation of the Fifth Amendment, Blue would at most be entitled to suppress the evidence and its fruits if they were sought to be used against him at trial." (*Id.* at 255, 86 S.Ct. at 1419).

In other words, the Court announced that the same exclusionary rule which it announced in *Murphy, supra,* and which is to be applied as between the state witness and the federal government, must likewise be applied to any illegally obtained evidence in the *Blue* case. *Blue* did not involve an immunity statute. Such an exclusionary rule is already applied in criminal cases to evidence obtained in violation of the Fourth Amendment, Mapp v. Ohio, 367 U.S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081 (1961), and to coerced confessions cases under the Fifth Amendment. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

The same kind of exclusionary rule was adopted by the Court of Appeals of New York in People v. Laino, 10 N.Y.2d 161, 218 N.Y.S.2d 647, 176 N.E.2d 571 (1961), when it ruled that when a prospective *defendant* in a criminal case is called before a grand jury and made to testify, such action violates the defendant's privilege against self-incrimination under the Constitution of the State of New York and the evidence thus obtained will be

excluded from use upon any subsequent criminal case against that defendant. The New York Court also ruled, however, that in order for a prospective defendant, or any other witness, called before a grand jury to receive absolute immunity from future prosecution as to anything said before the grand jury, the 1953 procedural amendments to the state's immunity law must be strictly complied with. Such procedure requires that a witness, *inter alia*, must specifically refuse to answer a particular question after having specifically invoked his privilege as to that particular question and, after having been ordered to do so, has, in fact, answered the question. It is only then that immunity is granted. The amendments were designed to protect against a prospective defendant or witness securing an "immunity bath", thus putting proper limits on transactional immunity. The Government's fears, expressed in this case, that transactional immunity inevitably leads to "immunity baths" are consequently ill-founded.

A grant of a use-restriction immunity alone has been found acceptable in cases involving public employees who are called in by their public employers to account for their performance as public employees. If such immunity is granted and a public employee refuses to account, he may be discharged but he may not be required to waive his immunity under threat of discharge. The rationale for this is that the state as employer is different from the state as prosecutor. Uniformed Sanitation Men Ass'n, Inc. v. Commissioner of Sanitation of New York, *supra*.

However, as the Second Circuit acknowledged in the last cited case, and as we learn from the concurring opinion in Stevens v. Marks, *supra*, *Murphy* did not rule out a requirement of transactional immunity as between the witness and the questioning sovereign. Uniformed Sanitation Men Ass'n, Inc. v. Commission-

er of Sanitation of New York, *supra*, 426 F.2d at 626.[13]

Moreover, there seems to be good and compelling reasons why in the case of the government, as prosecutor, the use restriction immunity alone is constitutionally unacceptable. As Mr. Justice Frankfurter ruled in *Ullman, supra*, the Supreme Court is duty bound to give to the self-incrimination clause a liberal construction if we are to keep faith with the patriots who fought for inclusion of the Bill of Rights in the Constitution and if we are to acknowledge the great policies and purposes underlying that clause.

The privilege against self-incrimination is the heart of the system—our accusatorial system—which we long ago opted for in preference to an inquisitorial system of criminal justice. The privilege is shorthand for the citizen's unabridged guarantee that he can never be forced to convict himself. Removing the protection against future prosecution by the questioning sovereign can only have the effect, in the judgment of the citizen, of diminishing that age old guarantee and undermining the system.

If the Government can proceed to prosecute a witness after that witness has testified before a grand jury on the theory of independent evidence, the Government's present burden of shouldering the whole load is greatly lessened.[14] Any independent source would be greatly illuminated by the prior testimony. The determination, in the first instance, to seek an independent source would often flow from an admission of guilt or from the questions and the nature of the responses. Consequently, use-restriction immunity as opposed to prosecution immunity plainly does not protect a witness against all of the perils which are manifestly within the orbit of the privilege.

When the questioning government grants only use-restriction immunity it is really giving up nothing in return for the witness' forced waiver of the priv-

---

13. In In re Zicarelli, *supra*, ftn. 4, the Supreme Court of New Jersey ruled to the contrary.

14. 8 Wigmore, Evidence 317 (McNaughton rev., 1961).

ilege. The government gains knowledge and information about the crimes of the witness and the crimes of others from the witness and retains the right to prosecute the witness who has given up his right not to incriminate himself. This is not consistent with our constitutional notions of fair play.

If the granting government could proceed to prosecute after a witness has testified but would have the burden in every case of proving that its evidence is untainted [15] (especially in the case of the instant Act which is applicable to all federal criminal laws), a motion to suppress the evidence would inevitably follow every such indictment. Assuming that there would be many such cases because of Congress' determination to eliminate transactional immunity, the federal district courts would have an automatic new burden of protracted litigation.

To say that a witness can successfully rebut the Government's proof that its source is untainted is to be naive about the imbalance which daily attends the resources of Government as opposed to those of the average defendant in a criminal case.

Those who claim that the transactional immunity requirement in the *Counselman* situation has been *sub silentio* overruled by *Murphy,* or other subsequent cases, must explain away the Court's decision in *Albertson, supra,* which precisely presented the *Counselman* situation and which was decided only a year after *Murphy.* The Government has not done so. Since the Supreme Court has not overruled its requirement that as between the questioning sovereign and the witness only an immunity statute granting transactional immunity is sufficiently broad to replace the constitutional privilege, this court is without power to do so. Upholding the constitutionality of Title II of the Organized Crime Control Act of 1970 would represent a reversal of long established precedent. Clearly, any such major extirpation of a part of our "constitutional fabric", in addition to being decreed by the Congress, must be affirmed by the Supreme Court before this court is asked to do so.[16]

The Government's application is, therefore, denied.

15. Murphy v. Waterfront Commission of New York, 378 U.S. 52, 79 n. 18, 84 S.Ct. 1594, 12 L.Ed.2d 678.

16. In Piccirillo v. United States, 400 U.S. 548, 91 S.Ct. 520, 27 L.Ed.2d 596 (1971). decided after this opinion was drafted, five Justices of Supreme Court did not reach the immunity question. Justice Brennan, dissenting, reached the question and held that the questioning sovereign was required to grant absolute immunity from prosecution.